# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| **In re** | **Chapter 11** |
| **WASHINGTON MUTUAL, INC., et al.,** | **Case No. 08-12229 (MFW)** |
| **Debtors.** | **(Jointly Administered)** |
| **BROADBILL INVESTMENT CORP.,** | |
| **Plaintiff** | |
| **v.** | **Adv. Proc. No. 10-50911 (MFW)** |
| **WASHINGTON MUTUAL, INC., et al.,** | |
| **Defendant.** | |

## MEMORANDUM OF LAW IN SUPPORT
## OF DEFENDANT'S MOTION TO DISMISS

Marcia L. Goldstein, Esq.
Brian S. Rosen, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

ATTORNEYS FOR DEFENDANT

Mark D. Collins (No. 2981)
Chun I. Jang (No. 4790)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

Dated: May 17, 2010
        Wilmington, Delaware

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................ ii

PRELIMINARY STATEMENT .......................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................................... 3

    I.    The Debtors and the Chapter 11 Cases ................................................................................ 3

    II.   The Litigation Tracking Warrants & the Anchor Litigation ............................................... 5

    III.  The Debtors' Proposed Plan ................................................................................................. 8

    IV.  The Broadbill Action ........................................................................................................... 9

ARGUMENT ....................................................................................................................................... 9

    I.    Broadbill Lacks Standing to Bring Any
         Cause of Action in Connection with the LTWs................................................................. 11

    II.   Broadbill's Claim for "Breach" Is Unripe ....................................................................... 13

    III.  The LTW Holders Do Not Have a Right to Participate in
         Any Recovery from the Anchor Litigation........................................................................ 15

    IV.  The LTWs Are Equity Securities and Thus Constitute Equity Interests .................... 16

CONCLUSION................................................................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**

*In re Am. W. Airlines, Inc.,*
179 B.R 893, 897 (Bankr. D. Ariz. 1995)................................................................................17

*Ashcroft v. Iqbal,*
129 S.Ct. 1937, 1949 (2009)................................................................................10, 18

*In re Baldwin-United Corp., D.H,*
52 B.R. 549, 552 (Bankr. S.D. Ohio 1985)................................................................................17

*Beal Sav. Bank v. Sommer,*
865 N.E.2d 1210, 1211 (N.Y. 2007) ................................................................................11

*In re Burlington Coat Factory Sec. Litig.,*
114 F.3d 1410, 1429-30 (3d Cir. 1997) ................................................................................10

*Children's Seashore House v. Waldman,*
197 F.3d 654, 662 (3d Cir. 1999) cert. denied, 530 U.S. 1275 (2000) ................................10

*Doug Grant, Inc. v. Greater Bay Casino Corp.,*
232 F.3d 173, 184 (3d Cir. 2000) ................................................................................10

*Duel Glass v. Search Fin. Servs., Inc. (In re Search Fin. Servs. Acceptance Corp.),*
Case No. 39832129RCM11, 2000 WL 256889, at *2-4 (N.D. Tex. Mar. 7, 2000) ..............16

*In re Enron Corp.,*
302 B.R. 463 (Bankr. S.D.N.Y. 2003)................................................................................11

*Fowler v. UPMC Shadyside,*
578 F.3d 203, 210 (3d Cir. 2009)................................................................................11,18

*Glassman v. Computervision Corp.,*
90 F.3d 617, 628 (1st Cir. 1996) ................................................................................10

*In re Insilco Techs., Inc.,*
480 F.3d 212, 218 (3d Cir. 2007)................................................................................17

*In re Lawton,*
261 B.R. 774, 777 (Bankr. M.D. Fla. 2001) ................................................................................17

*McTernan v. City of York, Pennsylvania,*
577 F.3d 521, 530 (3d Cir. 2009) ................................................................................10

*Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*,
Case No. 08-11586 (KG), 2010 WL 908490, at *3 (Bankr. D. Del. Mar. 12, 2010) ...........10

*Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.*,
113 F.3d 405, 417 (3d Cir. 1997) .................................................................................10

*Travelers Ins. Co. v. Obusek*,
72 F.3d 1148, 1154 (3d Cir. 1995).................................................................................13

**Statutes**

11 U.S.C. § 101(16) ....................................................................................................3, 16

Financial Institutions Reform, Recovery, and Enforcement Act of 1989,
Pub. L. No. 101-73, 103 Stat. 183 (1989)...........................................................................5

**Other Authorities**

S. REP. 95-989, 1978 U.S.C.C.A.N. 5787 .........................................................................17

Washington Mutual, Inc. ("WMI") respectfully submits this Memorandum of Law in support of its motion, dated May 17, 2010 (the "Motion"), for an order, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Rules") and Rules 7012 and 7009 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), dismissing the complaint (the "Complaint") filed by Broadbill Investment Corp. ("Broadbill").[1]

## PRELIMINARY STATEMENT

Broadbill is a purported holder of certain litigation tracking warrants that, upon the occurrence of certain contingencies, grant the holder the right to purchase WMI common stock. Broadbill is seeking a declaratory judgment from the Court that: (a) the warrant holders have allowed claims against, and not equity interests in, WMI; and (b) WMI breached the agreement governing the warrants. Based upon the prevailing agreements, and applicable law, the Complaint must be dismissed as a matter of law.

First, Broadbill does not have standing to seek the relief requested. Pursuant to the Amended Agreement, as defined below, an individual warrant holder may not sue or commence an action against WMI on account of the warrants unless: (a) such holder has given written notice to WMI of the substance of any dispute; (b) holders of at least twenty-five percent (25%) of the issued and outstanding warrants have given written notice to WMI of their support for the institution of a proceeding to resolve such dispute; (c) such holder has given written notice of the dispute and support thereof to the appointed warrant agent; and (d) the warrant agent failed or refused to act within thirty (30) days of receipt of notice. Then, and only then, may a holder have the right to

---

[1] Pursuant to the parties' agreement, WMI's time to respond to the Complaint was extended from May 12, 2010 to May 17, 2010.

commence litigation to enforce any rights pursuant to the Amended Agreement. Quite simply, because it has failed to satisfy the prerequisites of the Amended Agreement and failed to plead that it maintains standing to commence the instant action, Broadbill lacks standing and is precluded from commencing the litigation, and dismissal of the Complaint in this adversary proceeding is warranted.

Second, in the event that this Court somehow allowed Broadbill standing to proceed with its claim, such claim would not be ripe because the warrant holders are still unable to exercise the warrants. In the Third Circuit, if an action is based upon a contingency, it cannot be ripe. Here, the cause of action is in fact based upon a contingency – the occurrence of a "trigger" event, as defined in the Amended Agreement, allowing for the exercise of the warrants. Broadbill simply cannot show that the trigger for the exercise of the warrants occurred. Consequently, any claim on account of the warrants, were such a claim to exist, would not be ripe.

Third, pursuant to the Amended Agreement, warrant holders have no right to participate directly in any recovery from the subject litigation, the Anchor Litigation, as defined below. The Amended Agreement expressly provides that any recovery from the Anchor Litigation shall be controlled by a former subsidiary of WMI. Warrant holders are only entitled to purchase shares of WMI common stock upon the occurrence of the trigger events and the exercise of the warrants. Because the warrant holder have no direct right to the proceeds, the relief that Broadbill requests – direct entitlement to the proceeds of the subject litigation – cannot be granted.

Finally, Broadbill's Complaint must be dismissed to the extent it seeks a declaration that the LTWs are not equity securities. There can be no doubt that the

litigation tracking warrants constitute equity securities as defined in section 101(16) of title 11 of the United States Code (the "Bankruptcy Code"). 11 U.S.C. § 101(16). The plain language and legislative history of section 101(16) make clear that equity securities include warrants to purchase a corporation's common stock. Moreover, the courts have consistently ruled that warrants constitute equity interests. The warrants at issue here are based upon the warrant holders' equity interests in a company acquired by WMI, and under the warrant agreement, would enable the warrant holders to acquire greater equity in WMI. Thus, the warrants plainly constitute both equity interests and equity securities, not claims, and Broadbill's request for a ruling inconsistent with this conclusion must be dismissed.[2]

Based on these reasons, as will be set forth further below, clear authority from this and other jurisdictions warrants entry of an order dismissing the Complaint with prejudice and without leave to replead.

## FACTUAL BACKGROUND

### I. The Debtors And The Chapter 11 Cases

On September 26, 2008 (the "Commencement Date"), WMI and WMI Investment Corp. ("WMI Investment," and together with WMI, the "Debtors"), each commenced with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") a voluntary case pursuant to chapter 11 of the Bankruptcy Code. On October 3, 2008, the Bankruptcy Court entered an order pursuant to Bankruptcy Rule 1015(b) authorizing the joint administration of the Debtors' chapter 11 cases. As of the

---

[2] And to the extent that the warrant holders assert claims arising from the purchase or sale of the warrants, the Debtors reserve their right to seek subordination of such claims as is proper under section 510(b) of the Bankruptcy Code.

date hereof, the Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

WMI, a holding company incorporated in the State of Washington, is the direct parent of WMI Investment, which served as an investment vehicle for WMI and holds a variety of securities. WMI Investment is incorporated in the State of Delaware.

Prior to the Commencement Date, WMI operated as a savings and loan holding company that owned Washington Mutual Bank ("WMB") and, indirectly, such bank's subsidiaries, including Washington Mutual Bank fsb ("WMBfsb"). WMI owns all of the outstanding stock of WMB, and WMI also has certain non-banking, non-debtor subsidiaries. Like all savings and loan holding companies, WMI was subject to regulation by the Office of Thrift Supervision (the "OTS"). WMB and WMBfsb, in turn, like all depository institutions with federal thrift charters, were subject to regulation and examination by the OTS. In addition, WMI's banking and nonbanking subsidiaries were overseen by various federal and state authorities, including the Federal Deposit Insurance Corporation (the "FDIC").

On September 25, 2008, the OTS, by order number 2008-36, closed WMB, appointed the FDIC as receiver for WMB (the "FDIC Receiver"), and advised that the FDIC Receiver was immediately taking possession of WMB's assets (the "Receivership"). Immediately after its appointment as receiver, the FDIC Receiver sold substantially all the assets of WMB, including the stock of WMBfsb, to JPMorgan Chase Bank, National Association ("JPMC") pursuant to that certain Purchase and Assumption Agreement, Whole Bank, dated as of September 25, 2008 (the "Purchase and Assumption Agreement").

## II.  The Litigation Tracking Warrants & the Anchor Litigation

This adversary proceeding is tangentially related to that certain litigation styled *Anchor Savings Bank, FSB v. United States* (the "Anchor Litigation"), Case No. 95-39C (Fed. Cl.), pending before the Honorable Lawrence J. Block in the United States Court of Federal Claims (the "Federal Claims Court"), commenced by Anchor Savings Bank, FSB ("Anchor Savings Bank") against the United States of America (the "Government").  Therein, Anchor Savings Bank has alleged that the Government's passage of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183 (1989) ("FIRREA") breached Anchor Savings Bank's supervisory merger contracts with the Government, which allowed Anchor Savings Bank to treat supervisory goodwill as regulatory capital.[3]

At the time of the Government's alleged breach, Anchor Savings Bank was a publicly traded savings and loan institution.  In 1993, Anchor Savings Bank formed a publicly-traded holding company, Anchor Bancorp, Inc. ("Anchor Bancorp"), and Anchor Savings Bank became a wholly-owned subsidiary of Anchor Bancorp.  Shortly after the commencement of the Anchor Litigation, Anchor Bancorp was acquired by Dime Bancorp, Inc. ("Dime Bancorp").

On December 22, 2000 (the "Record Date"), for no consideration, pursuant to that certain Warrant Agreement, dated December 21, 2000 (the "Warrant

---

[3] In the late 1980's, Anchor Savings Bank acquired four failing financial institutions at the behest and under the supervision of federal thrift regulators.  Pursuant to the acquisition agreement, the government allowed Anchor Savings Bank to account for "supervisory goodwill" as a capital asset, which counted towards Anchor Savings Bank's regulatory capital requirements.  When FIRREA was enacted, substantially all of Anchor Savings Bank's supervisory goodwill no longer counted as a capital asset.  As a result, Anchor Savings Bank became a severely undercapitalized financial institution and was forced to make radical operational changes to avoid being seized and liquidated by regulators.  Wash. Mut., Inc., Current Report (Form 8-K), at 1-3 (Mar. 12, 2003).

Agreement"), Dime Bancorp distributed litigation tracking warrants (the "LTWs") to its then current shareholders. The LTWs were registered pursuant to a registration statement, dated October 20, 2000 (as amended on December 15, 2000, the "Registration Statement"). Pursuant to the Warrant Agreement, each stockholder of record on the Record Date would receive one LTW for each share of Dime Bancorp common stock that such stockholder owned on the Record Date. Dime Bancorp distributed the LTWs "in an effort to pass along the potential value of [Dime Bancorp's] claim against the government to [Dime Bancorp's] existing shareholders in the form of tradeable securities." Registration Statement, at 1.

On January 4, 2002, WMI merged with and acquired Dime Bancorp. Thereafter, on January 7, 2002, Dime Savings Bank merged with and into WMB, with WMB as the surviving institution. Pursuant to that certain Amended and Restated Warrant Agreement, dated January 7, 2002 (as amended, the "Amended Agreement"), referenced by Broadbill in paragraph 3 of the Complaint and attached hereto as Exhibit A, WMI succeeded to Dime Bancorp's rights and obligations with respect to the LTWs. Amended Agreement, Recitals. Section 6.3 of the Amended Agreement provides, in relevant part, that "[WMB] will retain sole and exclusive control of the [Anchor] Litigation and retain 100% of any recovery from the [Anchor] Litigation." Amended Agreement, § 6.3.

In addition, as a result of the Dime Bancorp – WMI merger, each holder of an LTW (collectively, the "LTW Holders") is entitled to receive, upon the exercise of an LTW, WMI common stock. *Id.* The trigger for the right to purchase WMI common stock (the "Trigger") requires the occurrence of *all* of the following: (i) actual receipt of

cash or property pursuant to a final non-appealable judgment in or a final settlement of the Anchor Litigation; (ii) a determination by WMB of the amount of the adjusted recovery (after certain reductions); and (iii) the receipt of all regulatory approvals necessary to issue the WMI shares upon exercise of the LTWs. Amended Agreement, § 1.1. Although the LTWs are convertible into shares of WMI common stock, the LTWs are not exercisable *unless and until* the Trigger events occur and the period to exercise the LTWs commences. *Id* at § 1.1.

Upon the occurrence of the Trigger, each LTW Holder would receive the *right to purchase* such LTW Holders' pro rata portion of an amount of WMI common stock equal to the adjusted Anchor Litigation recovery divided by the product of WMI's adjusted stock price multiplied by the number of LTWs issued or reserved for issuance on the Record Date. Registration Statement, at 3. As of the date hereof, despite the contrary statements in the Complaint, none of the Trigger events have occurred, as there is still no final judgment in the Anchor Litigation.

<u>The Pending Anchor Litigation</u>

Following a trial, the Federal Claims Court concluded that FIRREA breached the Government's supervisory goodwill contracts with Anchor Savings Bank. The Federal Claims Court then conducted a trial on what damages, if any, would be awarded. By opinion, dated March 14, 2008, the Federal Claims Court held that Anchor Savings Bank was entitled to recover lost profits and other damages. On July 17, 2008, an amended judgment was entered in favor of Anchor Savings Bank in the amount of approximately $356 million. On September 9, 2008, the Government appealed to the

United States Court of Appeals for the Federal Circuit (the "Court of Appeals"). On September 22, 2008, Anchor Savings Bank cross-appealed.

On March 10, 2010, the Court of Appeals affirmed the Federal Claims Court's ruling in part, but remanded the case and instructed the Federal Claims Court to examine its damages calculation in light of the Court of Appeals' opinion. The case is now pending before the Federal Claims Court. No final order awarding damages has been issued and, upon information and belief, no recovery has been received by WMB.

### III. The Debtors' Proposed Plan

On March 26, 2010, the Debtors filed their proposed chapter 11 reorganization plan (as amended May 16, 2010, the "Plan"). The Debtors attached to the Plan a proposed global settlement agreement, by and among WMI, JPMC, the FDIC, and others, which agreement incorporated the terms and provisions of the understanding between the parties and announced to the Bankruptcy Court on March 12, 2010 (the "Global Settlement Agreement"). Thereafter, on May 16, 2010, the Debtors filed an amended Plan, which reflected, among other things, amendments to the terms of the Global Settlement Agreement.

Section 2.13(b) of the Global Settlement Agreement provides, in pertinent part, that (i) WMI and the FDIC shall be deemed to have sold, transferred and assigned, as of September 26, 2008, to JPMC any and all right, title, and interest they may have in the Anchor Litigation, free and clear of any liens, claims, interests, and encumbrances, including, without limitation, any liens, claims, interests, and encumbrances of LTW Holders as set forth in the Amended Agreement, other than the liens, claims, interests, and encumbrances, if any, of JPMC, and (ii) WMI and the FDIC shall be deemed to have

waived and released any and all rights and claims associated with the claims, causes of action, damages, liabilities, and recoveries associated with the Anchor Litigation.

Pursuant to Section 25.1 of the Plan, as of the effective date of the Plan, the LTWs, which are equity interests, are deemed extinguished, cancelled, and of no force and effect, and the LTW Holders shall receive no distribution on account thereof. Plan, § 25.1. Section 26.1 further provides that holders of WMI common stock shall receive no distribution under the Plan and the shares of WMI common stock similarly shall be deemed extinguished, cancelled, and of no force and effect. Plan, § 26.1.

## IV. The Broadbill Action

On April 12, 2010, Broadbill, purportedly a beneficial holder and owner of an unspecified number and amount of LTWs, commenced this adversary proceeding against WMI (the "Broadbill Action"), seeking, among other things, declaratory relief that (i) the sale and transfer of control over, and the recovery from, the Anchor Litigation to JPMC constitute a breach and default under Section 6.3 of the Amended Agreement, which gives rise to a claim in favor of the holders of LTWs for WMI's failure to provide the LTW holders with the proceeds from such sale and transfer; (ii) if WMI's existing common stock is to be extinguished or cancelled, Section 4.4 of the Amended Agreement mandates that the LTW holders have claims against WMI in the amount of the net proceeds of the Anchor Litigation; (iii) the LTWs do not constitute either stock warrants, equity securities or equity interests in WMI; and (iv) the LTWs represent the "right to payment" of value and are "claims" against WMI's estate. (Compl. ¶ 4-5.)

## ARGUMENT

Broadbill's complaint fails to state a claim upon which relief can be granted and thus cannot survive dismissal under Rule 12(b)(6) and Bankruptcy Rules

7012 and 7009. In order for a plaintiff to survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (citations omitted). In determining whether a complaint states a plausible claim for relief, the Court need not accept legal conclusions contained in the complaint as true. *McTernan v. City of York, Pennsylvania,* 577 F.3d 521, 530 (3d Cir. 2009) (citing *Iqbal,* 129 S.Ct. at 1949). In *Iqbal,* the Supreme Court made clear that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient to survive a motion to dismiss. *Iqbal,* 129 S.Ct. at 1949. *See also Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC),* Case No. 08-11586 (KG), 2010 WL 908490, at *3 (Bankr. D. Del. Mar. 12, 2010) ("Legal conclusions are not entitled to the presumption of truth") (citing *Iqbal,* 129 S.Ct. at 1949, and granting defendants' motion to dismiss).

A court need not credit a complaint's "bald assertions" or "legal conclusions" when deciding a motion to dismiss. *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1429-30 (3d Cir. 1997) (quoting *Glassman v. Computervision Corp.,* 90 F.3d 617, 628 (1st Cir. 1996)). Nor should the Court "accept as true unsupported conclusions and unwarranted inferences." *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.,* 113 F.3d 405, 417 (3d Cir. 1997); *see also Doug Grant, Inc. v. Greater Bay Casino Corp.,* 232 F.3d 173, 184 (3d Cir. 2000) (same). The Court may consider matters of public record even if they do not appear on the face of the Complaint. *Children's Seashore House v. Waldman,* 197 F.3d 654, 662 (3d Cir. 1999) *cert. denied,* 530 U.S. 1275 (2000).

Applying the above standards, Broadbill's complaint should be dismissed because Plaintiff has failed to plead any facts that would entitle it to relief from WMI. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (explaining that "conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss . . . . To prevent dismissal, all civil complaints must now set out 'sufficient factual matter' to show that the claim is facially plausible.") (quoting and citing *Iqbal*, 129 S.Ct. at 1948-49).

## I. BROADBILL LACKS STANDING TO BRING ANY CAUSE OF ACTION IN CONNECTION WITH THE LTWs

Where an agreement expressly defines the requirements for commencement of an action, and where a party fails to satisfy those requirements, such party lacks standing to commence an adversary proceeding. *See In re Enron Corp.*, 302 B.R. 463 (Bankr. S.D.N.Y. 2003) (explaining that the governing agreement expressly required majority consent and written demand prior to commencement of suit, and granting motion to dismiss for plaintiffs' lack of standing); *see also Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210, 1211 (N.Y. 2007) (affirming dismissal, under New York law, on the basis that, pursuant to the agreement entered into by consortium, which required collective action, individual member did not have standing to unilaterally commence a suit for breach of contract).[4]

Section 6.2 of the Amended Agreement sets forth the requirements necessary to be satisfied before an LTW Holder may seek to assert or enforce any claim with respect to the LTW. Specifically, Section 6.2 provides as follows:

---

[4] The Amended Agreement is governed by New York law. Amended Agreement, § 7.4.

> All rights of action in respect of the Warrants will be vested in the respective Holders; *provided, however*, that no Holder will have the right to enforce, institute or maintain any suit, action or proceeding against the Company to enforce, or otherwise act in respect of, the Warrants, *unless (a) such Holder has previously given written notice to the Company of the substance of such dispute, and Holders of at least 25% of the issued and outstanding Warrants have given written notice to the Company of their support for the institution of such proceeding to resolve such dispute, (b) such Holder has previously given written notice to the Warrant Agent of the substance of such dispute and of the support for the institution of such proceeding and (c) the Warrant Agent has not instituted appropriate proceedings with respect to such dispute within 30 days following the date of such written notice to the Warrant Agent*, it being understood and intended that the Warrant Agent has no obligation to institute proceedings and that no one or more Holders will have the right in any manner whatsoever to affect, disturb or prejudice the rights of any other Holders, or to obtain or to seek to obtain priority or preference over any other Holders or to enforce any rights of the Holders, except in the manner described in this Section 6.2 for the equal and ratable benefit of all Holders. Except as described above, no Holder will have the right to enforce, institute or maintain any suit, action or proceeding to enforce, or otherwise act in respect of, the Warrants.

Amended Agreement, § 6.2 (emphasis added).

Broadbill has not pled and the Complaint is devoid of any facts to establish that Broadbill has satisfied, or even attempted to satisfy, any of these agreed upon prerequisites to the instant action. In paragraph 8 of the Complaint, Broadbill alleges that it is a beneficial holder and owner of LTWs. (Compl. ¶ 8.) However, nowhere in the Complaint does Broadbill allege that it holds the number of issued LTWs required to proceed in a solitary manner under the 25% percentage of ownership threshold set forth in Section 6.2. Moreover, the Complaint does not assert that: (1) Broadbill gave notice to WMI of the substance of the dispute or that other Holders of at least 25% of the issued and outstanding LTWs gave notice to WMI of their support for

the institution of such proceeding; (2) Broadbill had previously given written notice to the Warrant Agent of the substance of such dispute and of the support for the institution of such proceeding; or (3) the Warrant Agent had not instituted appropriate proceedings with respect to such dispute within 30 days following the date of such written notice. Consequently, Broadbill lacks standing and dismissal of this Complaint is warranted.

## II.  BROADBILL'S CLAIM FOR "BREACH" IS UNRIPE

In the event that the claims Broadbill asserts are not dismissed out of hand, and WMI submits that they should be, the claims would not be ripe because Broadbill has failed to plead that the LTW Holders are able to exercise the LTWs. In the Third Circuit, to determine whether an action is ripe, courts must consider the following three elements and determine that all are met: "the 'adversity of the interest' between the parties to the action, the 'conclusiveness' of the declaratory judgment and 'the practical help, or utility' of the declaratory judgment." *Travelers Ins. Co. v. Obusek,* 72 F.3d 1148, 1154 (3d Cir. 1995) (citations omitted). If an action is based on a contingency, it cannot be ripe. *See id.* (explaining the adversity of interest element).

As of the date hereof, the exercise of the LTWs remains contingent. Pursuant to the Amended Agreement, and as stated above, the conditions for the Trigger, and the potential exercise of the LTWs, are: the receipt by WMB of any cash payment on account of a final judgment in the Anchor Litigation; a determination by WMB of the amount of the adjusted litigation recovery to be used in calculating any distribution to holders of the LTWs; and receipt of all regulatory approvals necessary to issue the shares of WMI common stock to be issued upon the exercise of the LTWs. Broadbill has not pled that any of these events occurred – nor could it. Furthermore, it is indisputable that the Anchor Litigation is still pending, and that there has been no actual recovery based

upon a final judgment or otherwise. As these events are conditions precedent to the exercise of the LTWs that still have not yet occurred, Broadbill's claim is not ripe.

Even if Broadbill's alleged claim were ripe, contrary to Broadbill's contention, neither WMI nor its board of directors are required under the Amended Agreement to allow an unsecured claim in favor of the LTW Holders. Broadbill argues that, pursuant to Section 4.4 of the Amended Agreement, "WMI and its Board of Directors must allow an unsecured claim in WMI's chapter 11 case in favor of the LTW Holders in an amount equal to the net proceeds of the Anchor Litigation." (Compl. ¶ 30.). Section 4.4 of the Amended Agreement does not contain any such mandate. In fact, Section 4.4 of the Amended Agreement provides as follows:

> If any event occurs as to which the foregoing provisions of this Article IV are not strictly applicable, or if strictly applicable, would not, in good faith judgment of the [Board], fairly and adequately protect the purchase rights of the Holders of the Warrants in accordance with the essential intent and principles of such provisions, *then the Board may make*, without the consent of the Holders, such adjustments to the terms of this Article IV, in accordance with such essential intent and principles, as will be reasonably necessary, in the good faith opinion of such Board, to protect such rights as aforesaid.

Amended Agreement, § 4.4 (emphasis added). As a plain reading of Section 4.4 indicates, neither WMI nor its board of directors is required to take any action upon the occurrence of events that might adversely affect the purchase rights of LTW Holders. Rather, the language expressly provides that any such action is discretionary. Section 4.4 simply does not require WMI to rewrite the Amended Agreement and give the LTW

Holders anything more than the right to purchase common equity upon the occurrence of the Trigger. Accordingly, Broadbill's reliance on Section 4.4 is misplaced.[5]

### III. THE LTW HOLDERS DO NOT HAVE A RIGHT TO PARTICIPATE IN ANY RECOVERY FROM THE ANCHOR LITIGATION

Furthermore, the LTW Holders contractually have no right to participate directly in any recovery from the Anchor Litigation. Pursuant to Section 6.3 of the Amended Agreement, "[WMB] will retain sole and exclusive control of the [Anchor] Litigation and retain 100% of any recovery from the [Anchor] Litigation." Amended Agreement, § 6.3. This language expressly precludes a claim by Broadbill, or any LTW Holder, for payment "of the net proceeds received for the sale or transfer of the Anchor Litigation . . . ." The Registration Statement further provides that LTW Holders "have no voting rights, *no liquidation preferences*, and no rights to dividends or distributions other than the right to exercise [their] LTWs to purchase shares of [WMI] common stock, based on the valuation formula, after the occurrence of the trigger." Registration Statement, at 5 (emphasis added).

Broadbill argues, however, that Section 6.3 of the Amended Agreement was breached when control over, and any recovery from, the Anchor Litigation was lost due to the seizure of WMB by the FDIC and the consequent sale of its assets to JPMC.[6] Specifically, Broadbill contends that, upon the FDIC's sale to JPMC pursuant to the Purchase and Assumption Agreement, WMI should have "taken the necessary steps to

---

[5] Moreover, if the claim is based on the treatment of the warrants in the plan, the time and place for contesting such treatment is in an objection to plan confirmation, not a separate lawsuit.

[6] According to Broadbill, Section 6.3 of the Amended Agreement "exists to protect the LTW Holders from the sale or transfer of the Anchor Litigation which would eliminate or avoid the occurrence of a Trigger and thereby frustrate the intent and purpose of the LTWs and the Agreements." Broadbill does not provide any basis for this inference, and the language of section 6.3 does not support such an inference.

consummate a Trigger." (Compl. ¶ 22.) Nothing in Section 6.3, however, imposes such duties on WMI, and Broadbill's fanciful suggestion otherwise should be rejected as a matter of law.

In sum, because the terms of the Amended Agreement do not provide LTW Holders with a claim against WMI for any recovery that may be awarded in the pending Anchor Litigation, dismissal of the Complaint is appropriate.

## IV. THE LTWs ARE EQUITY SECURITIES AND THUS CONSTITUTE EQUITY INTERESTS

Notwithstanding that the LTW Holders are not entitled to assert claims based upon a potential recovery from the Anchor Litigation, Broadbill's request for a declaratory judgment that the LTW Holders have "claims" must be denied because the LTWs are, as a matter of law, equity securities, and the LTWs therefore possess nothing more than equity interests. This request fails as a matter of law because, under the Bankruptcy Code, there can be no doubt that the LTWs constitute equity securities.

The Bankruptcy Code defines an "equity security" as:

(A) share in a corporation, whether or not transferable or denominated "stock", or similar security;

(B) interest of a limited partner in a limited partnership; or

(C) warrant or right, other than a right to convert, to purchase, sell, or subscribe to a share, security, or interest of a kind specified in subparagraph (A) or (B) of this paragraph.

11 U.S.C. § 101(16). The legislative history of section 101(16) expressly indicates that Congress intended for the definition of equity security to include "a warrant or right to subscribe to an equity security," but to exclude "a security, such as a convertible debenture, that is convertible into equity security, but has not been converted." S. REP.

95-989, 1978 U.S.C.C.A.N. 5787. Accordingly, "only a right to convert is not included in the definition of 'equity security' . . . A right to purchase however, is within the definition provided in the Bankruptcy Code." *In re Am. W. Airlines, Inc.*, 179 B.R 893, 897 (Bankr. D. Ariz. 1995) (citations and quotation marks omitted). In excluding convertible debentures from the meaning of "equity security," Congress thus intended only to carve out debt securities that are convertible to equity securities.

By contrast, "[s]tock options, as rights to purchase securities, are equity securities." *In re Lawton*, 261 B.R. 774, 777 (Bankr. M.D. Fla. 2001) (citations omitted). Likewise, a warrant that provides for the purchase of a company's stock, falls well within the meaning of equity security. *See Duel Glass v. Search Fin. Servs., Inc. (In re Search Fin. Servs. Acceptance Corp.)*, Case No. 39832129RCM11, 2000 WL 256889, at *2-4 (N.D. Tex. Mar. 7, 2000) (determining that warrants to purchase corporation's stock were equity securities, and affirming bankruptcy court's ruling that such warrants were equity interests); *see also In re Baldwin-United Corp., D.H.*, 52 B.R. 549, 552 (Bankr. S.D. Ohio 1985) (holding that, unlike "a guaranteed right to a cash payment in the future," claims to exercise the stock option portion of a stock option plan "are properly classified as equity security interests"). In distinguishing between "claims" and "equity interests," the Court of Appeals for the Third Circuit has stated that "[e]quity investment brings not a right to payment, but a share of ownership in the debtor's assets—a share that is subject to all of the debtor's payment obligations." *In re Insilco Techs., Inc.*, 480 F.3d 212, 218 (3d Cir. 2007).

Here, the Amended Agreement expressly provides that each LTW "represents the right to purchase shares or a portion of a share of Common Stock."

Amended Agreement, Recitals. The Amended Agreement further provides that each LTW "will, upon exercise thereof and subject to adjustment as provided [in the Amended Agreement], entitle the [LTW] Holder thereof to purchase the number of shares of [WMI] Common Stock" determined by the terms of the Amended Agreement. *Id.* at § 3.1. Accordingly, there can be no doubt that the LTWs qualify as "equity securities" under the Bankruptcy Code.

Broadbill alleges that the LTWs do not satisfy the legal requirements for stock purchase warrants, equity securities, or equity interests, on the purported basis that, "because the aggregate value of shares issuable pursuant to the LTWs does not change upon a change in value of WMI's common stock, the LTW's do not contain the hallmark characteristic of equity – equity risk." (Compl. ¶ 33.) Broadbill cites no authority for this dubious proposition that equity shares do not qualify as equity securities if they are awarded to a holder in numbers based on external factors.

Broadbill also alleges that the Dime Bancorp board of directors did not intend for the LTWs to be stock purchase warrants, equity securities, or equity interests. Broadbill pleads no facts to support this conclusory assertion and therefore on this motion to dismiss must be ignored. *See Fowler*, 578 F.3d at 210 (explaining that "conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss . . . To prevent dismissal, all civil complaints must now set out 'sufficient factual matter' to show that the claim is facially plausible.") (quoting and citing *Iqbal*, 129 S.Ct. at 1948-49). Moreover, based upon the plain language of the Amended Agreement, it is evident that the LTWs are equity interests regardless of the subjective mindset of the board of

directors. Accordingly, Broadbill's naked assertion that the intent behind the distribution of the LTWs was to confer something other than equity interests is baseless.

Based on the foregoing reasons, there is no basis for the relief requested in the Complaint.

## CONCLUSION

WHEREFORE WMI respectfully requests entry of an order dismissing the Complaint with prejudice and without leave to replead.

Dated: Wilmington, Delaware
      May 17, 2010

                                        _Earl Shapiro_
                                    Mark D. Collins (No. 2981)
                                    Chun I. Jang (No. 4790)
                                    Zachary I. Shapiro (No. 5103)
                                    RICHARDS, LAYTON & FINGER, P.A.
                                    One Rodney Square
                                    920 North King Street
                                    Wilmington, Delaware 19801
                                    Telephone: (302) 651-7700
                                    Facsimile: (302) 651-7701

                                        – and –

                                    Marcia L. Goldstein, Esq.
                                    Brian S. Rosen, Esq.
                                    WEIL, GOTSHAL & MANGES LLP
                                    767 Fifth Avenue
                                    New York, New York 10153
                                    Telephone: (212) 310-8000
                                    Facsimile: (212) 310-8007

                                    Attorneys for Defendant