## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| WASHINGTON MUTUAL, INC., et al.,[1] | Case No. 08-12229 (MFW) |
| Debtors. | (Jointly Administered) |

NANTAHALA CAPITAL PARTNERS, LP, BLACKWELL CAPITAL PARTNERS, LLC, AXICON PARTNERS, LLC, BRENNUS FUND LIMITED, COSTA BRAVA PARTNERSHIP III, LLP, and SONTERRA CAPITAL MASTER FUND, LTD., individually and on behalf of all holders of Litigation Tracking Warrants originally issued by Dime Bancorp,

Plaintiffs,

v.

WASHINGTON MUTUAL, INC., CHARLES LILLIS, DAVID BONDERMAN, JAMES STEVER, MARGARET OSMER-MCQUADE, ORIN SMITH, PHILLIP MATTHEWS, REGINA MONTOYA, STEPHEN FRANK, STEPHEN CHAZEN, THOMAS LEPPERT, WILLIAM REED, JR., and MICHAEL MURPHY,

Defendants.

Adv. Pro. No. 10-50911 (MFW)

## POST-TRIAL REPLY MEMORANDUM OF LAW OF CLASS-PLAINTIFFS

KING & SPALDING
Arthur Steinberg
1185 Avenue of the Americas
New York, NY 10036
Telephone: 212-556-2100
Facsimile: 212-556-2222

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: (i) Washington Mutual, Inc. (3725); and (ii) WMI Investment Corp. (5395).

SCHINDLER COHEN & HOCHMAN LLP
Jonathan L. Hochman
Daniel E. Shaw
100 Wall Street, 15th Floor
New York, NY 10005
Telephone: 212-277-6300
Facsimile: 212-277-6333

THE ROSNER LAW GROUP LLC
Frederick B. Rosner (DE# 3995)
Scott J. Leonhardt (DE #4885)
824 Market Street, Suite 810
Wilmington, DE 19801
Telephone: 302-777-1111

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ........................................................................................................... 3

I.    The Economic Substance Of LTWs Makes Them Claims
      In Bankruptcy ................................................................................................. 3

      A.    LTWs Fit Squarely Within The Definition Of Claims ............................. 3

      B.    Case Law Does Not Indicate That LTWs Are Equity ............................. 5

      C.    The SEC's Position On Warrant Classification And
            SFAS 150 Are Relevant ....................................................................... 8

II.   The LTW Holders Own A Beneficial Interest In The Anchor Litigation .............. 10

III.  WMI Breached The Warrant Agreements ......................................................... 12

      A.    The Doctrine Of *Contra Proferentum* Applies ................................... 12

      B.    LTW Holders Are Entitled To An Election Under Section
            4.2(b) Of The 2000 Warrant Agreement .............................................. 13

      C.    Plaintiffs' Claim For Breach Of Section 4.2(b) Is Not
            Time-Barred ....................................................................................... 15

            1.    There Is No Evidence That The Breach Occurred
                  In 2001 Or 2002 ........................................................................ 15

            2.    The Purported 2002 Warrant Agreement Is Invalid And
                  Inauthentic And Should Therefore Be Ignored By The Court ......... 17

            3.    Even If The Purported 2002 Warrant Agreement Were
                  Admissible And Effective, The Statute Of Limitations Did
                  Not Accrue From Its Execution ................................................... 18

      D.    WMI Breached Section 4.2(d) Of The 2003 Warrant Agreement ........... 19

      E.    WMI Breached Section 4.4 Of The 2003 Warrant Agreement ............... 20

      F.    WMI Breached Sections 4.5 And 6.3 Of The Warrant Agreements ........ 20

IV. Section 510(b) Does Not Apply To The Claims Of LTW Holders........................................21

    A.  LTW Claims Do Not Arise From A Purchase Or Sale Of
        A Debtor Security ......................................................................................22

    B.  Section 510(b)'s Policies Do Not Apply To The LTW Claims....................................24

CONCLUSION.................................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*61 West 62 Owners Corp. v. Harkness Apt. Owners Corp.,*
635 N.Y.S.2d 631 (N.Y. App. Div. 1995) ............................................................... 19

*151 West Assocs. v. Printsiples Fabric Corp.,*
61 N.Y.2d 732, 472 N.Y.S.2d 909 (1984) ............................................................. 12

*In re ANC Rental Corp.,*
324 B.R. 228 (Bankr. D. Del. 2005) ..................................................................... 12

*Barnes v. Alexander,*
232 U.S. 117 (1914) ............................................................................................ 12

*Baroda Hill Invs. Ltd v. Telegroup, Inc. (In re Telegroup, Inc.),*
281 F.3d 133 (3d Cir. 2002) ........................................................................... 21, 22

*In re Betacom of Phoenix, Inc.,*
240 F.3d 823 (9th Cir. 2001) ............................................................................... 22

*Carrieri v. Jobs.com,*
393 F.3d 508 (5th Cir. 2004) ....................................................................... 6, 9, 10

*In re Color Tile,*
Nos. 96-76 (HSB), 2000 WL 152129 (D. Del. Feb. 9, 2000) .............................. 5, 6

*In re EBC I, Inc. (f/k/a eToys, Inc.),*
380 B.R. 348 (Bankr. D. Del. 2008) ....................................................................... 9

*Employers Ins. of Wausau v. 1133 Bldg. Corp.,*
No. 93 Civ 1393 (MBM), 1994 WL 62390 (S.D.N.Y. Feb. 24, 1994) ................... 16

*In re Enron Corp.,*
341 B.R. 141 (Bankr. S.D.N.Y. 2006) .................................................................. 22

*Fifth Third Bank v. Automobili Lamborghini S.P.A.,*
09 C 3253, 2011 WL 307406 (N.D. Ill. Jan. 26, 2011) ....................................... 18

*Harbinger Capital Partners Master Fund I, Ltd. v. Granite Broadcasting Corp.,*
906 A.2d 218 (Del. Ch. 2006) ........................................................................... 5, 9

*In re International Wireless Communications Holdings, Inc.,*
257 B.R. 739 (Bankr. D. Del. 2001) ..................................................................... 23

*Jellinick v. Joseph J. Naples & Assocs., Inc.,*
   744 N.Y.S.2d 610 (N.Y. App. Div. 2002) ............................................................13

*Johnson v. Home State Bank,*
   501 U.S. 78, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991) ........................................5

*In re Lids Corp.,*
   281 B.R. 535 (Bankr. D. Del. 2002) ...................................................................9

*In re MarketXt Holdings Corp.,*
   361 B.R. 369 (Bankr. S.D.N.Y. 2007)..............................................................24

*In re Med Diversified Inc.,*
   461 F.3d 251 (2d Cir. 2006)........................................................................24, 25

*Morgan Svcs., Inc. v. Abrams,*
   801 N.Y.S.2d 457 (N.Y. App. Div. 2005) ........................................................18

*In re Morristown Lincoln-Mercury, Inc.,*
   42 B.R. 413 (Bankr. E.D. Tenn. 1984) ...............................................................6

*Official Committee of Unsecured Creditors v. American Capital Financial Services, Inc.*
   *(In re Mobile Tool International, Inc.),*
   306 B.R. 778 (Bankr. D. Del. 2004) .................................................................23

*Palmetto Partners, L.P. v. AJW Qualified Partners, LLC,*
   921 N.Y.S.2d 260, 264 (N.Y. App. Div. 2011) ................................................15

*Rachmani Corp. v. 9 East 96th Street Apt. Corp.,*
   629 N.Y.S.2d 382, 384 (N.Y. App. Div. 1995) ................................................16

*In re Revco,*
   118 B.R. 468 (N.D. Ohio 1990)..........................................................................5

*Stuart Leventhal, FZUS, Inc. v. Franzus Co., Inc.,*
   No. 88 CIV 3547 (MBM), 1988 WL 132868 (S.D.N.Y. Dec. 6, 1988) ............15

*Yudell v. Ann Israel & Assocs., Inc.,*
   669 N.Y.S.2d 580 (N.Y. App. Div. 1998) ........................................................13

**STATUTES AND RULES**

11 U.S.C. § 101(5)....................................................................................6, 10

Federal Rule of Evidence 901(a) ...........................................................................17

**OTHER AUTHORITIES**

FASB Statement of Financial Accounting Concepts No. 2........................................9

NASD Listing Rule 5725 ................................................................................................6

Public Company Accounting Oversight Board, Interim Auditing Standards AU § 411.06 ...........9

## PRELIMINARY STATEMENT

WMI has actively tried to frustrate the LTW[2] holders' rights throughout this case – from failing to provide legally required notices (like the Claims Bar Date notice), to adopting the Settlement Noteholders' strategy of giving the Anchor Litigation to JP Morgan free and clear of the LTW holders' rights. WMI's post-trial brief is a continuation of that strategy, in which WMI, *inter alia*: (a) ignores dispositive evidence; (b) lifts snippets of testimony out of context; (c) belabors false analogies to dissimilar financial instruments; (d) contorts provisions of the Warrant Agreements without evidentiary support; (e) conjectures about facts and then assumes them into existence; and (f) mints post-trial theories to prop up their expert's testimonial failures.

LTWs are the direct progeny of LPCs and share the same purpose: to transfer, at issuance, the value of goodwill litigations to securities holders. WMI improperly conflates a feature of the LTWs (that they were structured, in part, to address perceived tax considerations) with their economic essence (a claim to 85% of the net Anchor Litigation recovery). WMI does this by adopting the false premise that stock was the LTWs' exclusive payment currency – even though every witness acknowledged that was not true, and even though Article IV of the Warrant Agreement expressly provides to the contrary. In the end, WMI's failed approach cannot obscure the mountain of evidence proving that the actual intent of the LTWs was to transfer value, in any currency necessary. Nor can it refute Mr. Levine's analytical framework (shared by the SEC and the accounting boards) that classifies LTWs as liabilities.

WMI's brief proffers false analogies to preferred stock and tracking stock. The documents governing these instruments emphasize that their holders will be paid **only** from funds legally available to stockholders and, in the case of tracking stock, expressly warn that it is

---

[2]    Capitalized terms not otherwise defined herein have the meanings ascribed to them in Plaintiffs' opening post-trial brief.

common stock of the company, subject to the company's operational and financial risks. WMI's purported analogies thus backfire because LTWs do not have these equity warnings and therefore plainly do not share the economic essence of preferred stock or tracking stock. Indeed, the LTW Registration Statement explicitly states that their risks *are different* from those of Dime's common stock.

WMI also now asserts that the Court should simply ignore the position of the SEC and the accounting boards that LTWs are liabilities. WMI's new view was not shared by Dr. Chamberlain in her expert reports, in which she cited accounting literature. Nor was that WMI's view when it analyzed the PIERS instrument. As Mr. Levine testified, the reason why the SEC and the accounting boards classify something as a liability is *because they believe that the economic essence of the transaction warrants that type of characterization*. Plaintiffs have never argued that accounting treatment, by itself, is outcome dispositive or that it trumps established case law – but that does not mean it should be ignored in this case of first impression.

WMI has no real response to the evidence that beneficial ownership of 85% of the Anchor Litigation proceeds was given to the LTW holders, a point crystallized by Dr. Chamberlain's admission that ownership *of the litigation proceeds* was transferred to the LTW holders at the time the LTWs were issued. WMI also acknowledges Sarkozy's testimony that LTWs were designed to transfer 85% of the net litigation proceeds to Dime's shareholders, at issuance. By definition, the beneficial interest given by Dime to the LTW holders in 2000, cannot now be given to the creditors of Dime's acquirer (WMI). Equitable remedies such as constructive trust and unjust enrichment are appropriate to ensure that LTW holders receive that value.

WMI's brief also cannot circumvent its breach of the Warrant Agreements. Its brand new argument – that Section 4.2(b), by its terms, does not apply – is belied, *inter alia*, by the January 4, 2002 Agreement, which expressly states that WMI agreed to make adjustments pursuant to Section 4.2(b). This agreement, combined with the language of the Merger Agreement and its drafts and Sarkozy's testimony, proves that LTW holders were to get the same consideration as Dime common shareholders and disposes of WMI's contention that LTW holders were not entitled to a cash election.

WMI's Section 4.4 argument is a rehash of its losing summary judgment argument. As Sarkozy testified, the fundamental purpose of the LTWs was to transfer 85% of the net recovery to the LTW holders. If other provisions of Article IV failed to do that, Section 4.4 (the "Other Events" section) provided the mechanism to transfer such value. (LTWX 195 (Sarkozy Dep.) at 88:10-16.) Because WMI has adduced no evidence to the contrary, the ambiguities in Section 4.4 should be construed against WMI, as the drafter.

Finally, LTWs cannot be subordinated pursuant to Section 510(b) because the claims asserted do not arise from a purchase or sale of a debtor security.

## ARGUMENT

### I. The Economic Substance Of LTWs Makes Them Claims In Bankruptcy

#### A. LTWs Fit Squarely Within The Definition Of Claims

Plaintiffs never disputed that the initial currency for payment of the LTWs was to be stock. (WMI Br. at 4.) But that does not determine the *economic essence* of the LTWs. The facts adduced at trial demonstrate that, while certain provisions of the Warrant Agreement were drafted with tax considerations in mind, the fundamental purpose of LTWs was to transfer value to Dime's shareholders. WMI's brief ignores the litany of contemporaneous documents and

press releases, as well as the clear testimony of Sarkozy (among others), all of which indicate

that the fundamental purpose of LTWs, like LPCs, was to transfer 85% of Dime's economic

interest in a litigation recovery to its shareholders. (Pl. Opening Br. at 1-2, 8-11.) As Sarkozy

made clear, the essential intent and principles of the LTWs had nothing to do with taxes:

> Q.   . . . [I]n your understanding of the essential intents and principles of the
> LTW transaction, did that include anything about the tax status to the recipients?
> A.   No.
> (LTWX 195 at 140:23-141:3.)[3]

Because the fundamental purpose of the LTWs was to transfer 85% of the net Anchor

Litigation proceeds, LTWs fit squarely within the Bankruptcy Code's definition of a "claim"

which is a:

> (A) **right to payment**, **whether or not such right is** reduced to judgment,
> liquidated, **unliquidated**, fixed, **contingent**, matured, **unmatured**, disputed,
> undisputed, **legal**, **equitable**, secured, or unsecured, or (B) **right to an equitable
> remedy for breach of performance** if such breach gives rise to a right to
> payment…. 11 U.S.C. § 101(5) (emphasis added).

---

[3]   WMI's misplaced reliance on a snippet of Eitel's testimony to support its position on the economic
essence of LTWs speaks volumes. *First*, Eitel can hardly be considered an unbiased observer. He represented JP
Morgan in connection with the Global Settlement, which resulted in WMI's breach of the Warrant Agreement by the
transfer of the Anchor Litigation to JP Morgan, free and clear of LTW holders' claims. Also, Eitel was first
interviewed by WMI's counsel and then prepared by them for hours prior to his deposition. (LTWX 193 (Eitel
Dep.) at 9:5-13:15; 131:12-133:25; 176:2-20.) *Second*, Eitel avoided answering all questions about what he told
WMI's lawyers during these prep sessions and also refused to testify as to what he told the Dime Board over ten
years ago relating to the LTWs. Eitel's reticence was due to WMI's invocation of an alleged attorney/client
privilege. (*Id.* at 10:2-19; 13:12-15; 132:4-10.) *Third*, Eitel's prepared statement, quoted on page 2 of WMI's brief,
is wrong when he states that funds need to be upstreamed for the Trigger to occur. He also concedes that his
assumption that Dime's stock price will go up by the extent of the Anchor Litigation recovery could be wrong.
*Fourth*, Eitel prefaces his prepared speech with the admission that his entire recollection as to how LTWs worked
was "sketchy," and that he had not reviewed the 2000 Warrant Agreement in twelve years. When pressed later at
his deposition as to what he remembered, "sketchy" seems like a vast overstatement. Eitel could not remember the
substance of any discussions relating to the LTWs. (*Id.* at 129:4-9.) He could not remember anything or any
discussions about Article IV of the Warrant Agreement. (*Id.* at 135:9-13; 135:25-136:8.) *Fifth*, after Eitel gave his
snippet of testimony, he later conceded that, because of the Adjustment section, and specifically Sections 4.2 and
4.4, at the time of the Trigger event, LTWs could very well be payable in something other than stock. (*Id.* at 156:4-
8.) He also later admitted that he did not recall what were the essential intent and principles of the LTWs. (*Id.* at
156:15-21.) And he conceded, even though he was the experienced lawyer who reviewed drafts of the 2000
Warrant Agreement, that he could not recall any discussion as to what would occur to the LTWs if Dime filed for
bankruptcy. (*Id.* at 150:25-151:7.) The failure to discuss this issue is telling because it suggests that Dime's
bankruptcy would not have any impact on the value already given to LTW holders.

A right to payment is an enforceable obligation, *Johnson v. Home State Bank*, 501 U.S. 78, 83, 111 S.Ct. 2150, 2154, 115 L.Ed.2d 66 (1991), which is exactly what LTW holders received by means of the Warrant Agreements. (*See, e.g.*, Section 6.2 of the Warrant Agreements (LTWX 1, 4), which contemplates enforcement by LTW holders of "[a]ll rights of action in respect of the Warrants.")[4]

## B. Case Law Does Not Indicate That LTWs Are Equity

To avoid the obvious conclusion that LTWs are claims, WMI cites a number of cases involving other securities, each of which is dissimilar to LTWs in critical respects. Cases like *In re Color Tile*, Nos. 96-76 (HSB), 2000 WL 152129 (D. Del. Feb. 9, 2000) and *Harbinger Capital Partners Master Fund I, Ltd. v. Granite Broadcasting Corp.*, 906 A.2d 218 (Del. Ch. 2006) involved redeemable preferred stock. WMI uses these cases to advance its contention that where "certainty of payment" is lacking, a security is equity, and not debt. (WMI Br. at 20.) Even a cursory reading of these cases, however, reveals that (1) they actually turn on the interpretation of the governing documents, and (2) WMI has completely misapprehended the term "certainty of payment" as used in these cases.

As the *Color Tile* court stated, ***"[w]hether a security constitutes equity or debt depends on the interpretation of the contract*** between the corporation and the security holders." 2000 WL 152129, at *4 (emphasis added). The private placement memorandum for Color Tile's preferred shares, in sharp contrast to this case, indicated that Color Tile's credit facilities had priority over its shareholders and further stated that the preferred shareholders would be entitled to payment ***only from assets available to pay stockholders***. *Id.* at *4-*5; *see also In re Revco*, 118 B.R. 468, 474 (N.D. Ohio 1990) ("Generally, the rights of shareholders to redeem stock are

---

[4]  Plaintiffs' equitable remedy for a constructive trust or similarly styled relief also constitutes a claim within the meaning of the Bankruptcy Code.

not guaranteed but are dependent on the financial solvency of the corporation. Accordingly, the mandatory redemption provision of convertible preferred stock is an interest and not a claim...."); *Carrieri v. Jobs.com*, 393 F.3d 508, 525 (5th Cir. 2004) ("The Rights Documents plainly conditioned these rights on the Debtor having 'legally available funds.'"). Thus the "certainty of payment" that these cases discuss has nothing to do with the type of external contingency present in the LTWs – *i.e.*, whether the litigation would pay off.[5] Rather, these are cases in which the disclosure documents indicated that redemption of preferred shares was *subject to* the availability of surplus capital and was lower in priority than payment of liabilities.

Unlike *Color Tile* and similar cases, the LTW documents do not say that they are equity or are lower in priority than debt. Rather, the evidence adduced here proves that the risk warnings for LTWs had nothing to do with Dime's operations or solvency but focused on the likelihood and timing of receipt of litigation proceeds. (TR1 89:24-90:24; LTWX 7 at 4-6.)[6]

Casting about for other analogies that might cut in its favor, WMI has now concluded that "litigation tracking warrants are the children of tracking stocks." (WMI Br. at 23.) Oddly, after a year of litigation, two expert reports, and a trial, WMI only stumbled upon this startling bit of

---

[5] Indeed, WMI's reading of "certainty of payment" would effectively eliminate ***contingent*** rights to payment from the Bankruptcy Code's definition of claims, in which they are expressly included, thus transforming ***all*** contingent liabilities into equity. 11 U.S.C. § 101(5). That is clearly wrong; bankruptcy courts widely recognize that contingent liabilities constitute claims under the Bankruptcy Code. *See, e.g., In re Morristown Lincoln-Mercury, Inc.*, 42 B.R. 413, 418-19 (Bankr. E.D. Tenn. 1984).

[6] The *Color Tile* court noted that, in interpreting the contractual documents, courts have considered various factors to distinguish debt from equity. 2000 WL 152129, at *4. The majority of these factors clearly militate in favor of treating LTWs as debt: (1) the intent of the parties as demonstrated by evidence of the purpose of LTWs; (2) the right to enforce payment; (3) the absence of voting rights; and (4) the lack of contribution by LTW holders. The factor as to the label of the document is not relevant since warrants can be for debt or equity. *See, e.g.,* NASD Listing Rule 5725 (dealing with Index Warrants which are payable in cash and are clearly claims). On the maturity date factor, Dr. Chamberlain actually claims (at times) that the LTWs have a maturity which is based on a certain number of days after the Trigger. This aspect of Dr. Chamberlain's conflicting testimony is relevant for this purpose because it distinguishes LTWs from stock, which has no date or event upon which it pays off. And the final factor as to certainty of payment in the event of insolvency or liquidation, is of course what this dispute is about; Plaintiffs contend that there are mandated adjustments based on certain events which have occurred and that require treating the LTWs as debt.

purported financial genealogy in its post-trial brief.  No one found this analogy before because it is not an apt comparison.[7]  As Chamberlain, Levine, and Sarkozy unequivocally stated, the LTWs are derived from LPCs – not tracking stocks.  (TR1at 50:21-25; LTWX 233 at ¶ 33; LTWX 195 at 55:11-56:19.)  Moreover, tracking stocks and LTWs are different in a number of fundamental respects.  For example, tracking stocks do not pay a variable number of shares to deliver a fixed amount of value.  LTWs, however, just like LPCs, deliver a fixed portion of value (the goodwill litigation recovery).  Dr. Chamberlain was forced to admit that LPCs may well be liabilities (TR3at 156:3-14), which no doubt explains WMI's ardor to unearth other comparisons, however inapposite.

Finally (and dispositively), a comparison of the registrations statements for tracking stocks and for LTWs actually provides a compelling reason that LTWs are liabilities: they do not contain equity warnings typical of tracking stocks.  For example, the prospectus for Sprint tracking stock, known as "PCS stock," stated:

> **HOLDERS OF PCS STOCK ARE SUBJECT TO THE RISKS ASSOCIATED WITH AN INVESTMENT IN A SINGLE CORPORATION AND ALL OF SPRINT'S BUSINESSES, ASSETS AND LIABILITIES. EVENTS ATTRIBUTABLE TO THE FON GROUP [the non-PCS portion of Sprint] THAT AFFECT SPRINT'S RESULTS OF OPERATIONS OR FINANCIAL CONDITION COULD AFFECT THE RESULTS OF OPERATIONS OR FINANCIAL POSITION OF THE PCS GROUP OR THE MARKET PRICE OF THE PCS STOCK. ANY NET LOSSES OF THE FON GROUP OR THE PCS GROUP, AND DIVIDENDS OR DISTRIBUTIONS ON, OR REPURCHASES OF, FON STOCK, PCS STOCK OR PREFERRED STOCK OR OTHER STOCK OR INTERESTS WILL REDUCE THE FUNDS OF SPRINT THAT ARE LEGALLY AVAILABLE FOR PAYMENT OF FUTURE DIVIDENDS ON THE PCS STOCK. SPRINT DOES NOT EXPECT TO PAY DIVIDENDS ON THE PCS STOCK IN THE FORESEEABLE FUTURE.**

---

[7]  *See* Dr. Chamberlain's own reports indicating that the motivation for issuing LPCs and LTWs was identical. (LTWX 233 at ¶¶ 25-28; LTWX 243 at ¶¶ 24-26.)

OWNERSHIP OF PCS STOCK DOES NOT REPRESENT A DIRECT
LEGAL INTEREST IN THE ASSETS AND LIABILITIES OF THE PCS
GROUP. RATHER, THE PCS STOCK IS COMMON STOCK OF SPRINT
REPRESENTING AN OWNERSHIP INTEREST IN SPRINT.[8]

These tracking stock registration statements make unmistakably clear that tracking stocks are

common equity of the issuing corporation, which, as in the redeemable preferred stock cases,

will only be paid out of "legally available funds." The LTW Registration Statement contained

no such warnings; rather, it said the exact opposite: "[a]n investment in the *LTWs involves*

*different risks and considerations from an investment in the common stock* of a savings and

loan holding company such as Dime Bancorp." (LTWX 7 at 6 (emphasis added).) The absence

of these express "equity" warnings in the Eitel-drafted Registration Statement makes clear that

the LTWs had a different essence and purpose. Thus, under *Color Tile*'s focus on governing

documents, LTWs are not equity interests.

## C. The SEC's Position On Warrant Classification And SFAS 150 Are Relevant

Tellingly, WMI does not dispute that LTWs should be classified as liabilities under SEC

guidance or SFAS 150. Instead, it argues that such classification rules are irrelevant. (This

despite the fact that Dr. Chamberlain relied on accounting literature herself – until it proved not

to support her. (*Compare* LTWX 233 (Chamberlain Rprt.) at ¶¶ 83-84 *and* TR3 at 208:7-

209:2.)) Of course, Plaintiffs have not claimed that the proper accounting treatment is

---

[8] Amendment No. 1 to Form S-3/A of Sprint Corporation, filed January 22, 1999, p. 16 (capitalization in original; emphasis added); *see also* Form S-3 of Staples Inc., filed February 18, 2000, pp. 7, 16-17 ("Holders of Staples.com stock [one of the tracking stocks cited by WMI] are common stockholders of Staples and, as such are subject to all the risks associated with investments in Staples and all of its businesses. . . . Further, in any liquidation, holders of Staples.com stock will not have rights to any specific assets of Staples.com but will receive a share of the net assets of Staples . . . .") (Note also that Mr. Eitel's firm, **Sullivan & Cromwell**, is listed as counsel on this Staples Form S-3.). Because WMI raised the issue of tracking stock for the first time in their post-trial brief, these public filings, of which the Court can take judicial notice, were not included as trial exhibits.

dispositive.[9] Rather, the basis for the accounting treatment of LTWs as liabilities (*i.e.,* that

LTWs deliver a fixed value) is also the economic essence of LTWs.[10] Mr. Levine's opinion

considers delivery of fixed value to be a critical factor in determining that LTWs are liabilities.[11]

There is no reason for the Court to close its eyes to the fact that Mr. Levine's opinion is

supported by both the SEC and accounting literature. The accounting literature is designed to

answer the very question at the heart of this dispute, namely, determining the economic essence

of LTWs.[12] For this reason, both the SEC's position and the accounting literature are relevant as

support for Mr. Levine's opinion.[13]

---

[9] For this reason, cases in which courts concluded that accounting treatment was not dispositive – *e.g. In re EBC I, Inc. (f/k/a eToys, Inc.)*, 380 B.R. 348 (Bankr. D. Del. 2008) – are beside the point. It bears noting that *eToys* is also distinguishable, since, in that case, it was the company that had the discretion to redeem the preferred stock, and further, that under SEC regulations, preferred stock was neither a current or long term liability. Here, the Adjustments section is mandatory, and under SEC rules, LTWs are liabilities. *Granite* hardly stands for the proposition that SFAS 150 can never be relevant. There, the court was considering preferred stock in a solvency analysis, which was generally understood based on established case law to be equity. *See Granite*, 316 A.2d at 225. The holding of *Granite* was merely that the promulgation of SFAS 150 would not overturn a large body of established case law related to the status of preferred stock while performing a solvency analysis. In this case, there is no case law establishing the classification for LTWs as equity. Moreover, it is generally recognized that accounting treatment will be considered an important factor in deciding whether a financial instrument is debt or equity. *See, e.g., In re Lids Corp.*, 281 B.R. 535, 542 (Bankr. D. Del. 2002) (holding that GAAP, though not determinative, can be relevant).

[10] WMI claims that Plaintiffs "offer no reason why a warrant allowing a holder to acquire a variable number of worthless common stock should be treated any differently in bankruptcy than a warrant for a fixed number of worthless shares." (WMI Br. at 5-6.) WMI assumes its conclusions by phrasing this question in terms of "worthless stock." The fact that the LTW holders were supposed to get a fixed amount of value, and that the Adjustments section of the Warrant Agreements (which WMI habitually ignores) provides for adjustments in the case of "Other Events," demonstrates that the LTW holders were not supposed to get worthless stock in bankruptcy, but rather an adjustment that would deliver value to them for the previously spun-off asset.

[11] By meeting the GAAP definition of liability, LTWs, by definition, meet the Bankruptcy Code definition of claim.

[12] Accounting literature emphasizes the importance of substance over form. *See* FASB Statement of Financial Accounting Concepts No. 2 ¶ 160 ("Substance over form is an idea that also has its proponents, but it is not included because it would be redundant. The quality of reliability and, in particular, of representational faithfulness leaves no room for accounting representations that subordinate substance to form."); Public Company Accounting Oversight Board, Interim Auditing Standards AU § 411.06 ("Generally accepted accounting principles recognize the importance of reporting transactions and events in accordance with their substance. The auditor should consider whether the substance of transactions or events differs materially from their form.").

[13] WMI also relies on *Carrieri*, which involved both preferred shares and warrants for preferred shares. The Court's holding was that both of those instruments were equity because they were conditioned on the debtor having legally available funds, which distinguishes them from LTWs. *See Carrieri*, 393 F.3d at 525. WMI also

Furthermore, Mr. Levine's analysis and SFAS 150 actually provide an analytical framework that is unmatched by anything WMI or Dr. Chamberlain have offered. Dr. Chamberlain's claim that she "considered the totality of the consideration"[14] is bereft of any identifiable methodology. By contrast, Mr. Levine, the SEC, and SFAS 150 actually provide a reasonable rule of decision, which indicates that LTWs are debt rather than equity.[15]

## II.    The LTW Holders Own A Beneficial Interest In The Anchor Litigation

In the Court's January 7, 2011 opinion denying WMI's summary judgment motion, the Court noted that WMI had conceded that an interpretation of the Warrant Agreement properly included consideration of other documents. (LTWX 219 at 11.) At trial, Plaintiffs introduced the following compelling extrinsic evidence. Margaret McQuade, a Dime director, testified that the Anchor Litigation was assigned to the LTW holders. (LTWX 194 at 91:21-25; 93:9-15.)

---

argues, based on language in *Carrieri*, that the LTWs cannot be claims because they have "no matured right to anything." (WMI Br. at 28.) This contorted interpretation of *Carrieri*, however, does violence to the Bankruptcy Code's definition of a "claim," which expressly includes rights to payment which are "unmatured." 11 U.S.C. §101(5)(A).

[14] It is ironic that Dr. Chamberlain would trumpet the importance of looking at the "totality of the circumstances" when analyzing whether the LTWs are debt or equity, but, in the context of her trial testimony, she decided to discount the important of legal documents, as well as the relevance of the accounting treatment of LTWs. To Dr. Chamberlain, "market gossip" is more important; although on cross-examination, she was forced to admit that there was no relevant market gossip to support her expert opinion. (TR3 at 201:1-206:8.)

[15] Space constraints do not permit Plaintiffs to respond to the sections in WMI's brief concerning Dr. Chamberlain's and Mr. Levine's testimony and opinions. Nor is it necessary to do so. Dr. Chamberlain's testimony was thoroughly discredited on cross-examination as demonstrated in Plaintiffs' opening brief. (Pl. Opening Br. at 17-27.) WMI's criticisms of Mr. Levine's testimony raise quibbles but do not come close to refuting the crux of his opinion that LTWs are liabilities.
     To nonetheless briefly address WMI's argument concerning the LTWs' regulatory risk factor, as proven at trial, that risk factor had to do with the payment of funds, is generally found in risk warnings of a regulated financial institution, including in debt securities instruments. Thus, the presence of this risk factor was not a distinguishing factor in making a debt vs. equity determination. (TR3 at 183:14-184:22.) Indeed, Dr. Chamberlain's trial explanation of regulatory risk, which was not in her expert report, made no sense. Dr. Chamberlain eventually stated that no one in the market at the time the LTWs were issued discussed with her regulatory risk for the LTWs. (*Id.* at 201:1-206:8.) At the Dime Board level, there was no discussion of any such risk either. Board member Margaret McQuade testified that there was not a Dime Board discussion: (a) as to the inability of Dime to issue shares upon a Trigger event (LTWX 194 at 57:15-21), (b) as to Dime Savings Bank's ability to upstream funds to Dime (*id.* at 63:2-8), or (c) as to what would happen to the LTWs if Dime went into bankruptcy (*id.* at 88:12-13). In short, the market and the Dime Board did not see the issues relating to the regulatory risk that first dawned on Dr. Chamberlain at trial.

Sarkozy, the creator of LTWs, said the same thing. (LTWX 195 at 56:4-19.) The Registration Statement for the LTWs explicitly states that the LTWs were intended to "pass along the potential value of our claim against the government to our existing stockholders…." (LTWX 6 at 4.) Dime issued press releases in 2000 stating that was what occurred. (LTWX 10 at 2.) Eitel wrote letters to the SEC before the LTWs were issued stating that is what would occur. (LTWX 37 at SC_LTW_000000054.00030.) High level SEC staff analyzed the LTW structure as a spin-off. (LTWX 54 at 10.) Dr. Chamberlain wrote in her expert report that the ownership interest in the litigation proceeds was transferred to the LTW holders. (LTWX 233 at ¶ 81.) Golden State accounted for the spin-off of the LTWs as a transfer of value to the LTW holders. (LTWX 50 at 6.) Dime accrued legal expenses which is consistent with a spin-off structure. (LTWX 195 at 62:20-64:7.) WMI has no answer to all of this evidence. Instead, it makes up the meaningless concept that the LTWs were an equity interest in a newly created "spin-off" to house the "litigation business." This concept falls apart once it is recognized that WMI is simultaneously arguing that (a) there is no separate "spin-off" structure, (b) there is no one accountable in running this so-called litigation business, and (c) there are no equity rights (voting/control) given to the LTW holders in connection with this hypothesized litigation business. WMI's argument that the economic essence of LTWs is stock currency for tax reasons similarly falls apart because the Warrant Agreements provide for adjustments to non-stock currency. Something that can be eviscerated by an adjustment cannot be the LTWs' economic essence.

In WMI's brief, it concedes that LTWs separate "ownership interests in the pending litigation proceeds from ownership interests in the thrift franchise." (WMI Br. at 24.) It also recognizes that there was an economic separation of the Anchor Litigation from Dime common

stock. (*Id.* at 25.) These concepts are the essence of the LTW holders' claim that WMI is required to transfer the spun-off value of the Anchor Litigation recovery to the LTW holders, who own the beneficial interest therein. The constructive trust remedy, rooted in preventing unjust enrichment, is a recognized remedy in bankruptcy[16] and is applicable here to prevent the injustice which WMI seeks to perpetuate.

## III. WMI Breached The Warrant Agreements

### A. The Doctrine Of *Contra Proferentum* Applies

WMI attempts to repudiate Black Letter contract law by asserting that *contra proferentum* does not apply to Plaintiffs' breach of contract claims. This doctrine was intended precisely for situations such as this, where WMI, the drafter of the 2003 Warrant Agreement (and the successor in interest to Dime, the drafter of the 2000 Warrant Agreement), has presented ***absolutely no extrinsic evidence*** in support of its interpretation of the relevant contractual provisions. *See 151 West Assocs. v. Printsiples Fabric Corp.*, 61 N.Y.2d 732, 734, 472 N.Y.S.2d 909, 910 (1984).

In *In re ANC Rental Corp.*, 324 BR 228 (Bankr. D. Del. 2005), this Court held that when it was reasonable to assume that the effect of future events would be included in a contract, the absence of such a provision reflected the parties' intent to exclude the impact of such future events from the contract. Here, WMI acknowledges that there is no express provision that addresses the impact of a bankruptcy on the LTWs. That omission therefore reflects the parties' intent that bankruptcy would not affect the value transferred to the LTW holders. And, based on the doctrine of *contra proferentum*, any ambiguity on this point should be construed against

---

[16] The basis for an equitable lien, also recognized in bankruptcy, would be applicable here. *See, e.g., Barnes v. Alexander*, 232 U.S. 117 (1914) (equitable lien established because recipient of funds had promised to share a portion thereof with another).

WMI as drafter. *See, e.g., Yudell v. Ann Israel & Assocs., Inc.*, 669 N.Y.S.2d 580, 581 (N.Y. App. Div. 1998) (silence with respect to a term in an agreement should be construed in favor of the party who played no role drafting the agreement); *see also Jellinick v. Joseph J. Naples & Assocs., Inc.*, 744 N.Y.S.2d 610, 613 (N.Y. App. Div. 2002) (court should interpret the terms of a contract so the parties reasonable expectations are realized).[17]

### B.     LTW Holders Are Entitled To An Election Under Section 4.2(b) Of The 2000 Warrant Agreement

WMI's brief debuts another new argument, claiming LTW holders' rights under Section 4.2(b) of the 2000 Warrant Agreement only apply to combinations where all shareholders receive unitary consideration. WMI fails to cite any evidence in support of this concocted argument. On the other hand, the record is replete with evidence that completely contradicts WMI's newly-manufactured contention, in particular: (1) the January 4, 2002 Agreement; (2) the Merger Agreement and its drafts; (3) Sarkozy's testimony; and (4) the Golden State precedent.

Most notably, the January 4, 2002 Agreement directly contradicts WMI's new interpretation of Section 4.2(b). That agreement indicates that the Dime/WMI Merger would "constitute a Combination" and expressly "confirm[ed] the rights of the Holders pursuant to Section 4.2 of the Warrant Agreement, ***including without limitation, Section 4.2(b)***...." (LTWX 2 at 1 (emphasis added).)

The Merger Agreement and its drafts also confirm the rights of LTW holders under Section 4.2(b). Trying to avoid this obvious conclusion, WMI invents a bizarre tale – entirely unsupported in the record – as to how counsel for Dime and WMI proceeded with negotiating

---

[17]   WMI's characterization of Plaintiffs as "sophisticated hedge funds" (WMI Br. at 48) is pointless. Plaintiffs are a certified class, encompassing ***all*** holders of LTWs – including numerous individuals who have held their LTWs since issuance – not just hedge funds.

and drafting the Merger Agreement. (WMI Br. at 57-59.) This fantasy is at war with the actual terms of the Merger Agreement, which provide that LTW holders would receive "Merger Consideration" – *i.e.*, precisely what Dime common stockholders would receive in the merger. WMI's brief also ignores the obvious meaning of the June 24, 2001 draft of the Merger Agreement, which noted that prior drafts, providing LTW holders would get WMI stock, were not consistent with Section 4.2 and suggested cross-referencing it instead. Consequently, the next draft resolved this issue by ensuring that LTW holders would get the same "Merger Consideration" that Dime stockholders were to receive. (LTWX 93 at STB 24172.)

WMI also ignores Sarkozy's testimony that the purpose of 4.2(b) was to provide LTW holders the right to whatever Dime common stockholders got. (*See* LTWX 195 at 96:14-97:18; TR1 at 98:15-99:5; TR3 at 109:5-110:4.) Accordingly, WMI's interpretation of Section 4.2(b) should be rejected, and the Court should find that Section 4.2(b) provides LTW holders the right to a cash election.[18]

Given that Section 4.2(b) obviously provides LTW holders with the same election as Dime common shareholders, the burden was on WMI to explain how or when that election was revoked. Of course, that was impossible because the evidence proves (*see* Pl. Opening Br. at 35-39) that no decision to revoke LTW holders' election rights was ever made.

---

[18] WMI's argument that Section 4.2(c) was not breached is likewise unavailing. In an attempt to discredit Plaintiffs' interpretation of this section, WMI cites to Sections 4.5 and 3.7 of the Warrant Agreement where the phrase "holders of Common stock" is used. However, in each of these sections, the word "the" precedes the phrase "holders of Common stock", which denotes **all** of the "holders of Common stock." By contrast, in Section 4.2(c), the phrase "holders of Common stock" is not preceded by the word "the," denoting therefore **some** but not all holders, which is Plaintiffs' interpretation of the provision. Moreover, WMI provided no evidence in support of its interpretation. Accordingly, Section 4.2(c) should be construed against WMI, the drafter, to mean that since some holders of Dime common stock received consideration for their shares "solely in cash," LTW holders also have "the right to receive upon exercise of each Warrant cash." (LTWX 1 at § 4.2(c).)

### C. **Plaintiffs' Claim For Breach Of Section 4.2(b) Is Not Time-Barred**

#### 1. **There Is No Evidence That The Breach Occurred In 2001 Or 2002**

Having no evidence in support of its interpretation of Section 4.2(b) of the 2000 Warrant Agreement, WMI argues that Plaintiffs' breach of contract claim began to accrue in mid-2001 to 2002, and that this claim is barred by New York's six-year statute of limitations. WMI, however, has not identified a single document or communication from 2001-2002 stating unequivocally that WMI intended not to perform the requirements of Article IV of the 2000 Warrant Agreement. WMI cannot even specify *exactly when* this purported repudiation occurred, stating only that, at the latest, repudiation occurred with the execution of the unfiled 2002 Warrant Agreement. This lack of precision is fatal to WMI's claim that these documents communicated the breach, thereby starting the statute of limitations clock for Plaintiffs' breach of contract claim. *See Palmetto Partners, L.P. v. AJW Qualified Partners, LLC*, 921 N.Y.S.2d 260, 264 (N.Y. App. Div. 2011) (breach requires an "*express and absolute refusal* to perform . . . . the announcement of an intention not to perform [must be] *positive and unequivocal*") (emphasis added); *Stuart Leventhal, FZUS, Inc. v. Franzus Co., Inc.*, No. 88 CIV 3547 (MBM), 1988 WL 132868, at *4 (S.D.N.Y. Dec. 6, 1988) (repudiation requires "a definite and unconditional repudiation of the contract by a party thereto, communicated to the other").

Neither SEC filings nor the amendment to the Warrant Agreement purport to revoke the LTW holders' right to a cash election pursuant to Section 4.2(b). The SEC filings indicate only that, to the extent holders were entitled to Dime stock, they would now receive WMI stock, since Dime stock would no longer exist.[19] (*See, e.g.*, LTWX 15 at 3.) Similarly, nothing in the 2003

---

[19] WMI's claim that it revoked the LTW holders' right to an election at some point in 2001 during the merger announcement process ignores the obvious point that these documents were distributed and/or filed with the SEC before the execution of the January 4, 2002 Agreement, which explicitly provides for a Section 4.2(b) adjustment. Most of these documents cross-reference the Warrant Agreement, which provides for the adjustments discussed by the Plaintiffs. And even Mr. Goulding, WMI's own witness, found these public filings hard to

(or the purported 2002) amendment to the 2000 Warrant Agreement expressly refers to the holders' cash election right being revoked. Because the 2003 Warrant Agreement is virtually the same as the 2000 Warrant Agreement, any intent to remove such right should have been clearly stated, and it is not. (LTWX 4.) WMI also ignores the testimony of its own witness, Richard Sohn, that the 2003 amendment to the 2000 Warrant Agreement *was not intended to remove the LTW holders' right to a cash election.* (LTWX 198 at 78:9-13.)[20]

Lastly, even if the SEC filings or the 2003 (or purported 2002) amendment to the 2000 Warrant Agreement could constitute an "express and absolute refusal to perform" the terms of the 2000 Warrant Agreement – which they do not – the statute of limitations period would not have began to run on that date. "[E]ven where unequivocal notice of a party's intent to renounce a contractual obligation is given, the injured party may elect to keep the contract in force and await the designated time for performance before bringing suit." *Rachmani Corp. v. 9 East 96th Street Apt. Corp.*, 629 N.Y.S.2d 382, 384 (N.Y. App. Div. 1995). In such circumstances, the statute of limitations does not begin to run at the time of the breach, but upon the other party's decision to treat it as a breach. *Employers Ins. of Wausau v. 1133 Bldg. Corp.*, No. 93 Civ. 1393 (MBM), 1994 WL 62390, at *3 (S.D.N.Y. Feb. 24, 1994). Accordingly, since the time for WMI to perform by giving the LTW holders a cash election did not occur in 2001-2002, the statute of limitations did not begin to run at that time. Indeed, Plaintiffs' breach of contract claim first occurred at the time that WMI failed to honor its Adjustment obligations during this bankruptcy proceeding, which was well within six years.

---

understand (TR4 at 67:23-70:1), making them a poor choice to base an unequivocal revocation of a right given to the LTW holders.

[20]  WMI could not amend the 2000 Warrant Agreement to revoke the cash election without violating Section 7.2 of the Warrant Agreement. (*See* LTWX 1.) As discussed by Chamberlain and Sarkozy, the cash election had clear benefits since it eliminates stock volatility prior to receipt of consideration. (TR3 at 194:24-195:25; LTWX 91 at 7.)

## 2. The Purported 2002 Warrant Agreement Is Invalid And Inauthentic And Should Therefore Be Ignored By The Court

Even if the 2002 purported Warrant Agreement were potentially relevant, WMI has not satisfied its burden of demonstrating its authenticity, as required by Federal Rule of Evidence 901(a). That agreement did not exist in WMI's files and was never filed with the SEC.[21] It is irregular on its face, as the signature page appears not to be a part of the document: it is located not at the end of the agreement but rather in between exhibits C and D; it is numbered as page 1 while it should be numbered page 23 (as the last page of the agreement is page 22); and it contains a different footer from the agreement itself. Furthermore, the signature page is undated, so there is no way to tell when or whether the 2002 Warrant Agreement was purportedly executed.[22]

No witness has authenticated the purported 2002 Warrant Agreement. Richard Sohn, despite actively trying, ***was never able to confirm that the 2002 Warrant Agreement had actually been executed by both parties and delivered***. (LTWX 198 at 118, 139-41.) WMI wildly overstates Dennis Treibel's and Julie Roh's purported knowledge of the document in a last-ditch attempt to authenticate it.[23]

---

[21] This is in sharp contrast with the 2003 Warrant Agreement which was publicly filed as an attachment to a Form 8-K press release.

[22] By contrast, the signature pages of the 2003 Warrant Agreement (separate pages for Julie Roh and Fay Chapman) are located directly after the agreement itself (not among the exhibits), contain the same file name footer, and are both correctly paginated as page 23. Further, **there is nothing linking the signature page to the purported 2002 agreement at all. Fay Chapman and Julie Roh, the purported signatories to the 2002 Warrant Agreement, both signed at least two other documents together, so it is quite possible that this signature page belonged to some other agreement.**

[23] Dennis Treibel was not the custodian of records for Mellon (LTWX 199 at 10) and could not testify as to how the purported 2002 Warrant Agreement was kept in Mellon's files. Nor could he explain the irregularities of the signature page (*id.* at 62-63), whether the signature page was even part of the agreement (*id.* at 63), or whether an executed copy of the agreement was ever delivered to WMI (*id.* at 63). Julie Roh failed to establish that the purported 2002 Warrant Agreement is anything that Roh had seen or signed. (LTWX 200 at 11.) Her deposition testimony consists entirely of what she ***would have done*** as a matter of typical business practice with respect to the purported 2002 Warrant Agreement, ***as opposed to what she actually did***. Notably, despite being the purported signatory of the agreement on behalf of Mellon, Roh ***does not actually remember signing it***. (*Id.* at 43.) Nor does

Because Defendants have failed to properly authenticate the purported 2002 Warrant Agreement, the document is inadmissible. *See, e.g., Fifth Third Bank v. Automobili Lamborghini S.P.A.*, 09 C 3253, 2011 WL 307406, at *4 (N.D. Ill. Jan. 26, 2011) (letter purporting to reflect parties' agreement was not properly authenticated, and thus inadmissible, where witness did not testify that he was familiar with the negotiations between the parties or that the letter reflects the terms of the agreement reached by the parties).

Moreover, the purported 2002 Warrant Agreement could not have started the statute of limitations running because it was not delivered and therefore was never effective. Where "parties have agreed that delivery is essential to the making of the contract, there is no agreement without it." *Morgan Svcs., Inc. v. Abrams*, 801 N.Y.S.2d 457, 457-58 (N.Y. App. Div. 2005). Here, the purported 2002 Warrant Agreement anticipated delivery. (LTWX 3 at § 7.7.) Consequently, the 2002 Warrant Agreement is a nullity.

### 3. Even If The Purported 2002 Warrant Agreement Were Admissible And Effective, The Statute Of Limitations Did Not Accrue From Its Execution

Even if the purported 2002 Warrant Agreement were valid and admissible, the execution of the 2003 Warrant Agreement – which Defendants' own witness, Sohn, contends amended both the 2000 Warrant Agreement and, to the extent it existed, the 2002 Warrant Agreement (LTWX 198 at 78:5-79:2) – restarted the limitations period. By its terms, the 2003 Warrant Agreement was an amendment of the 2000 Warrant Agreement. "This 2003 Amended and Restated Warrant Agreement . . . amends and restates the Warrant Agreement dated as of December 21, 2000, between Dime and Equiserve. . . ." (LTWX 4 at 1.) As a matter of law, a

---

Roh recall (1) who prepared the 2002 Warrant Agreement (*id.* at 32); (2) speaking to Fay Chapman about the document (*id.* at 43); (3) whether a fully executed agreement was ever delivered to WMI (*id.* at 34); or (4) why the signature page is irregular and out of order (*id.* at 31).

new amendment to an agreement resets the statute of limitations period in a breach of contract claim. *See 61 West 62 Owners Corp. v. Harkness Apt. Owners Corp.*, 635 N.Y.S.2d 631, 633 (N.Y. App. Div. 1995) (holding that "the plaintiff's breach of warranty claim was timely as a matter of law" where the relevant agreement, which was originally drafted outside the six-year statute of limitations period, was amended within the six years before the action was commenced).

### D.   **WMI Breached Section 4.2(d) Of The 2003 Warrant Agreement**

Plaintiffs' opening brief demonstrated that WMI breached Section 4.2(d) of the 2003 Warrant Agreement by failing to cause JP Morgan to honor LTW holders' rights. (Pl. Opening Br. at 44-48.)[24] WMI argues it need not have done so because the Global Settlement was not a sale of "substantially all of its assets." But WMI actually concedes that the Global Settlement is a sale of substantially all of its assets when it admits that before the sale it essentially had cash of approximately $1 billion, and after the sale, it will have cash proceeds of an additional $6.5 billion, and not much else. (WMI Br. at 66.) The Global Settlement defines what was sold, and, as Goulding testified, those assets added up to more than $7 billion (not the $40 million number set forth in WMI's brief). JP Morgan clearly is not paying WMI $6.5 billion for $40 million of assets. The approximately $7 billion sales price dwarfs the amount of cash WMI had before the sale, as well as the value of the unsold assets WMI retained after the JP Morgan sale.

WMI misconstrues the non-bankruptcy caselaw cited in Plaintiffs' opening brief, which provides a framework for interpreting the phrase "sale of substantially all assets" in an analogous context. WMI fails to explain why its involuntary (as compared to voluntary) loss of control

---

[24]  In the Court's January 7, 2011 opinion denying confirmation of WMI's plan, it noted that, to the extent "the LTW holders held a lien or other interest in the Anchor Litigation," (LTWX 247 at 50) – which, as demonstrated at trial, they do – such lien or other interest would attach to a $337 million LTW claim reserve to be established by WMI.

19

over WMB meaningfully distinguishes these cases. WMI's other arguments fare no better because (i) Section 4.2(d) is not an "anti-dilution" provision, (ii) LTWs are not equity warrants, and (iii) Section 4.2(d) is not limited by what WMI shareholders get.

## E.     WMI Breached Section 4.4 Of The 2003 Warrant Agreement

WMI and the Board breached their duty to act in "good faith" to "fairly and adequately protect the rights" of LTW holders, pursuant to Section 4.4, by, among other things, negotiating away the holders' right to value equal to 85% of the net litigation recovery. WMI does not offer *any evidence* in support of its argument that Section 4.4 is permissive, and that the Board could act arbitrarily, even when it knew that the essential intent and principles of the LTWs were being violated.[25] Section 4.4 must have a purpose, and WMI's "permissive" interpretation improperly makes it superfluous. WMI's argument merely regurgitates its losing summary judgment argument. (LTWX 219 at 10-12.) The evidence of the purpose of LTWs, Sarkozy's testimony, the mandatory adjustment language in the January 4, 2002 Agreement, the mandatory reference to adjustments in Section 4.5, and WMI's utter failure to offer any contrary evidence supports Plaintiffs' view that Section 4.4 imposes a mandatory duty. Finally, WMI's role as drafter of the Warrant Agreement dictates that Section 4.4 be construed against WMI.

## F.     WMI Breached Sections 4.5 And 6.3 Of The Warrant Agreements

WMI's brief does not rebut Plaintiffs' Section 4.5 argument, which references liquidation events and, in the context of discussing the type of notice which should be sent to LTW holders based on such events, states that adjustments "will be required" and that such adjustments may mandate the distribution of "securities or property" and not just common stock. Not only has

---

[25]     Section 4.4 specifically references the Board's duty and obligation. The provision has a meaning and imposes a duty on WMI's Board members. They are responsible to act in accordance with that duty, even if they never understood the scope of their obligations. As noted, Section 6.2 of the Warrant Agreement allows LTW holders to sue the Board for their dereliction of duty and obligation to the LTW holders.

WMI failed to make the mandatory adjustments referenced in Section 4.5 (and also Section 4.4), it has failed to send the requisite Section 4.5 notice to LTW holders since its bankruptcy filing.

WMI's brief also has no answer to Plaintiffs' Section 6.3 argument. The first sentence of that Section clearly states that WMB is supposed to control the Anchor Litigation. In contrast, the Global Settlement provides for a sale of the Anchor Litigation to JP Morgan. This Section 6.3 breach is exacerbated by WMI's Section 4.2(d) breach of failing to cause JP Morgan to assume the LTW obligations under the Warrant Agreement. It is also noteworthy that WMI now claims that Section 6.3 is "clear on its face," while it previously asserted in other litigation that Section 6.3 is not clear and that WMI, as contrasted to WMB, controlled the Anchor Litigation. WMI's role as the drafter of the Warrant Agreement also requires that Section 6.3 be construed against WMI.

## IV.    Section 510(b) Does Not Apply To The Claims Of LTW Holders

WMI's Section 510(b) argument is based on false premises. In *Baroda Hill Invs. Ltd v. Telegroup, Inc. (In re Telegroup, Inc.)*, 281 F.3d 133 (3d Cir. 2002), the Third Circuit stated that, in order for a claim to "arise from" the purchase or sale of stock such as to render it subject to Section 510(b), "there must obviously be some nexus or causal relationship between the claim and the sale of the security." *Telegroup*, 281 F.3d at 138. There is no "per se" rule as to when a claim "arises from" the sale of stock, making such claim subject to Section 510(b). *Telegroup* did make clear, however, that a claim would not be subordinated "simply because the identity of the claimant happens to be a shareholder, where the claim lacks any causal relationship to the purchase or sale of stock and when subordinating the claims would not further the policies

underlying § 510(b) which was intended to prevent shareholders from recovering their equity

investment in parity with general unsecured creditors."[26] *Id.* at 144 n.2.[27]

### A.  LTW Claims Do Not Arise From A Purchase Or Sale Of A Debtor Security

LTWs represent the right to receive 85% of the net value of the Anchor Litigation, not

the right to receive stock.  In particular, LTW claims do not arise from the "purchase" or "sale"

of a security.  LTWs were distributed for no consideration to Dime's stockholders.[28]  Thus, there

was no sale of the LTWs to LTW holders.  LTWs also have no exercise price.  Thus, there is no

purchase of a security contemplated for the receipt by LTW holders of the Anchor Litigation

value spun off to them.

The evidence adduced at trial demonstrated that the purpose of LTWs was to spin off

85% of the net Anchor Litigation recovery to Dime shareholders for **no consideration**.  This was

part of a defensive strategy formulated in response to Northfork Bank's hostile takeover attempt,

designed to influence Dime shareholders to support a "remain independent" strategy.  Dime

---

[26]  Courts look to the legislative history to aid in their interpretation of Section 510(b) because, as noted, the phrase "arising from" is ambiguous.  *See Telegroup*, 281 F.3d, at 138-39. The legislative history describes a situation totally distinct from the LTWs.  According to the legislative history of Section 510(b), "Congress enacted [Section] 510(b) to prevent disappointed shareholders from recovering their investment loss by using fraud and other securities claims to bootstrap their way to parity with general unsecured creditors in a bankruptcy proceeding." *Id.* at 142 (emphasis added). "Section 510(b) thus represents a Congressional judgment that, as between shareholders and general unsecured creditors, it is shareholders who should bear the risk of illegality in the issuance of stock in the event the issuer enters bankruptcy." *Id.*

[27]  *See In re Enron Corp.*, 341 B.R. 141, 149 (Bankr. S.D.N.Y. 2006) ("the phrase 'arising from' does not have a single, immediately evident meaning.  The Court must therefore look to the case law and policy considerations to inform its interpretation.").  *Enron* concerned unexercised stock options received by former employees, a situation not analogous to this case.

[28]  WMI improperly cites *In re Betacom of Phoenix, Inc.*, 240 F.3d 823 (9th Cir. 2001) for the naked proposition that it is irrelevant if the LTW holders received the LTWs as a "dividend" *Betacom* is not a dividend case.  It concerned the breach of a merger agreement, where the claimants were to be paid in stock that was held in escrow pending the completion of an audit which was never performed. The claimants – in their original complaint and first three amended complaints – sought a declaratory judgment as to the number of shares of stock they were due from the debtors. In their fourth amended complaint they first included a damage claim.  The Ninth Circuit found that the claimants "alleged that [the debtor] breached the Merger Agreement in failing to convey shares. . . . [T]heir claims are for damages surrounding the sale or purchase of a security of the debtor." *Id.* at 829.  Moreover, the court found that the claimants waited years to assert a claim for damages and "refused to accept tender of [the debtor's] shares when offered." *Id.* at 830.  In short, *Betacom* is not analogous to the situation here.

determined that it was likely that a future acquirer would also undervalue the Anchor Litigation, and thus, it used LTWs as a device to "front end" value to its shareholders. By definition, such value would not be shared with a future acquirer (such as WMI), or its creditors.

Eitel was thus correct in the following respects when he testified about LTWs: (a) LTWs were not an "equity offering" (LTWX 193 at 112:15-16); and (b) "LTWs are totally different. No one paid anything for them. They received them by way of a distribution – a dividend. **_There was no sale, for purposes of the securities laws, or as a practical matter, you know for any other purpose. No one purchased those securities._**" (*Id.* at 106:1-15 (emphasis added).) Thus, there is no nexus or causal relationship with a purchase or sale of anything, let alone stock, and therefore Section 510(b) does not apply.[29]

Moreover, LTWs were not issued by WMI, they were issued by Dime. WMI assumed the obligation to transfer the value of the Anchor Litigation previously spun off by Dime to its shareholders. The breach of that obligation – to transfer value already distributed to shareholders of a predecessor entity – is not the functional equivalent of a damage claim for which Section 510(b) was intended to apply.

In *Official Committee of Unsecured Creditors v. American Capital Financial Services, Inc. (In re Mobile Tool International, Inc.)*, 306 B.R. 778, 782 (Bankr. D. Del. 2004), this Court recognized that Section 510(b) has its limits when it did not subordinate a noteholder's claim. Courts have acknowledged a clear limit on the "but for" predicate for a Section 510(b) claim. If

_____

[29] Defendants' reliance on *In re International Wireless Communications Holdings, Inc.*, 257 B.R. 739 (Bankr. D. Del. 2001) is misplaced. In *Int'l Wireless*, the debtor entered into an agreement with one of its shareholders that required the debtor to consummate an IPO within a certain time frame. If it could not do so, it was required to either issue additional shares of stock, or file a registration statement so the stockholder could sell its shares. The debtor subsequently filed for bankruptcy and the shareholder filed a claim on account of the debtor's breach of the agreement. The court found that Section 510(b) was applicable because it related to a purchase of stock of the debtor. Here, the LTW holders' claim is not "for nondelivery of an equity security" and thus, the situation herein is clearly different. The cases cited by Defendants for the proposition that subordination applies to debt securities are irrelevant since LTW claims do not arise from the "purchase or sale" of a WMI security.

an issuer distributes a note to a stockholder as a dividend, or if stock is redeemed with a note, it is clear the note would not exist but for the stockholders' ownership of stock. Yet the case law is equally clear that such note is not subject to subordination under Section 510(b). *See In re MarketXt Holdings Corp.*, 361 B.R. 369, 389 (Bankr. S.D.N.Y. 2007), and the case cited therein.

### B. Section 510(b)'s Policies Do Not Apply To The LTW Claims

As stated by the Second Circuit in *In re Med Diversified Inc.*, 461 F.3d 251 (2d Cir. 2006), Section 510(b) subordination is generally supported in only two circumstances: the claimant "(1) took on the risk and return expectations of a shareholder, rather than a creditor, or (2) seeks to recover a contribution made to the equity pool presumably relied upon by creditors in deciding whether to extend credit to the debtor." *Id.* at 256. With respect to the first *Med Diversified* circumstance, none of the underlying LTW holders ever bargained for LTWs – they were given to them at no cost. Moreover, the LTW holders never received the potential for equity profit (and did not take any equity risk). The value of the LTWs is unaffected if Dime's or WMI's common stock is valued at $1 per share or $100 per share – LTW holders receive the value of the net proceeds of the Anchor Litigation regardless of the underlying value of WMI equity. The clear difference in risks between a Dime equity security and LTWs was spelled out in the Registration Statement: "An investment in the LTWs involves different risks and considerations from an investment in the common stock of a savings and loan holding company such as Dime Bancorp." (LTWX 7 at 6.)[30] In addition, absence of WMI equity risk to LTW holders is clear from Article IV of the Warrant Agreement, which provides that the currency for the transfer of value to the LTW holders is not limited to stock but, in circumstances like those here, can be cash or other property.

---

[30] Section 6.1 of the Warrant Agreement states explicitly that the LTW Holders are not stockholders or equity holders. (LTWX 1.)

With respect to the second *Med Diversified* circumstance, creditors of WMI did not advance credit to WMI based on LTWs being viewed as equity. LTWs are not listed in the Retained Earnings section of WMI's balance sheet.[31] And, as noted above, LTW holders never made a contribution to Dime's equity pool, having been given the LTWs for no consideration. Thus, LTW holders could never be seeking to recover a contribution (that was never made) from equity that was relied on by any creditor of WMI. Accordingly, the *Med Diversified* subordination rationales are not present here.

For all these reasons, Section 510(b) is not applicable to the LTW holders' claims.

---

[31] Dime LTWs are substantially the same as Golden State's LTWs. Golden State accounted for their LTWs by valuing only 15% of the anticipated "good will" litigation recovery on their balance sheet. The balance of the "good will" litigation recovery was deemed spun off to the Golden State LTW holders. The same economic result occurred in this case.

## CONCLUSION

For all of the foregoing reasons, and the arguments made in Plaintiffs' opening brief, the

Court should enter judgment granting Plaintiffs' claims in the Third Amended Complaint.

Dated: November 17, 2011
      New York, New York

/s/ Scott J. Leonhardt

ROSNER LAW GROUP LLC
Frederick B. Rosner (DE #3995)
Scott J. Leonhardt (DE #4885)
824 Market Street, Suite 810
Wilmington, DE 19801
Telephone: 302-777-1111

KING & SPALDING
Arthur Steinberg
1185 Avenue of the Americas
New York, NY 10036
Telephone: 212-556-2100
Facsimile: 212-556-2222

SCHINDLER COHEN & HOCHMAN LLP
Jonathan L. Hochman
Daniel E. Shaw
100 Wall Street, 15th Floor
New York, NY 10005
Telephone: 212-277-6300
Facsimile: 212-277-6333

*Counsel for Class-Plaintiffs*