## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WASHINGTON MUTUAL, INC., et al., | ) | Case No. 08-12229 (MFW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| | ) | |
| NANTAHALA CAPITAL PARTNERS, LP et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adv. No. 10-50911 (MFW) |
| | ) | |
| WASHINGTON MUTUAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

### OPINION[1]

Before the Court is the complaint of Nantahala Capital Partners, LP,[2] individually and on behalf of all holders of Litigation Tracking Warrants (the "LTW Holders") seeking a declaration that they hold debt, not equity, instruments and therefore are entitled to treatment as creditors under any plan of reorganization filed by Washington Mutual, Inc. ("WMI"). After trial and briefing, the Court concludes that judgment in favor of WMI is warranted for the reasons stated below.

---

[1] This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

[2] The Complaint was originally filed by Broadbill Investment Corporation, which has since withdrawn from the suit.

I.    BACKGROUND

On July 6, 1994, Anchor Savings Bank, FSB ("Anchor") and Dime Bancorp, Inc. ("Dime") entered into an agreement to merge. (JX 46.)[3]  In early 1995, Anchor commenced a lawsuit against the federal government alleging breach of contract and taking of property without compensation as a result of the statutory change in treatment of supervisory goodwill that Anchor had previously realized when it acquired certain failing savings and loan associations (the "Anchor Litigation").  (JX 282.)  As a result of the merger with Anchor, Dime became entitled to the proceeds, if any, from the Anchor Litigation.

In early 2000, Dime became the subject of a hostile takeover attempt by North Fork Bank.  (JX 193 at 19; JX 195 at 21; JX 194 at 19; Tr. 9/12/11 at 63.)  In an effort to remain independent, the Dime board of directors obtained an investment from Warburg Pincus for approximately 20% of its equity.  (JX 193 at 22; JX 195 at 21, 22, 28-29; Tr. 9/12/11 at 63.)  Because that equity infusion did not give sufficient value to the Anchor Litigation, and to provide value to shareholders, the Dime board decided to issue certificates to its existing shareholders representing the value of the Anchor Litigation.  (JX 193 at 26-28; JX 195 at 57, 63-64; JX 194 at 33-35, 38-40.)  On December 22, 2000, Dime

---

[3]  References to the record are: "JX" are references to the joint exhibits; "Tr. [date] at" are references to the trial transcripts.

issued Litigation Tracking Warrants (the "LTWs") to its

shareholders pursuant to a Warrant Agreement and Registration

Statement.  (JXs 1, 6 & 7.)

On June 25, 2001, Dime entered into an agreement to merge

with WMI.  (JXs 12, 15, 16, 17 & 18.)  WMI was a savings and loan

holding company, which held, inter alia, all of the stock of

Washington Mutual Bank ("WMB").  The LTW Warrant Agreement was

modified in Amended and Restated Warrant Agreements dated January

7, 2002, and March 11, 2003, between WMI and Mellon Bank, as

warrant agent.  (JXs 3 & 4.)[4]  Pursuant to the Amended Warrant

---

[4]  The LTW Holders question the authenticity of the Amended
Warrant Agreement dated January 7, 2002, because WMI had no copy
in its files, no original signed/dated copy was ever produced,
the signature page in the copy produced is out of order and has a
footer notation different from the footer on the pages of the
Agreement (though it is the same as the footer notation on some,
but not all, of the exhibits to the Agreement), there was no
evidence that the fully signed agreement was ever delivered, and
there was no SEC filing with respect to the execution of the 2002
Agreement while there was one with respect to the 2003 Agreement.
(Tr. 9/20/11 at 106; JXs 3, 4 & 29.)  The LTW Holders contend, as
a result, that the document is not authentic and is, therefore,
not admissible.  (Fed. R. Evid. 901 & 1002.)
     WMI argues that the document is authentic because it has
signatures of a representative of both the warrant agent and WMI,
original signatures are not required by the Federal Rules of
Evidence or the Agreement, the 2002 Agreement is referenced in
the 2003 Agreement, and representatives of both parties confirmed
its authenticity.  (Fed. R. Evid. 1041; JX 3 at § 7.7; JX 5; JX
200 at 7-11, 25-28, 33-35; JX 199 at 57-60.)
     The Court concludes that the evidence presented by WMI is
sufficient to authenticate the document and, therefore, it will
be admitted.  See, e.g., McQueeney v. Wilmington Trust 779 F.2d
916, 928 (3d Cir. 1985) (holding that "circumstantial evidence
may, in principle, suffice to authenticate a document" and that
"the burden of proof for authentication is slight").

Agreements, WMB was to prosecute and control the Anchor Litigation and, upon receipt of any recovery, the LTW Holders were entitled to receive common stock of WMI with a value representing 85% of the net recovery. (JXs 3 & 4.)

On July 17, 2008, the Court of Federal Claims entered judgment in favor of the plaintiffs in the Anchor Litigation in the amount of $356 million. (JX 283.) Cross appeals were filed. (JXs 284 & 285.) On March 10, 2010, the Court of Appeals for the Federal Circuit affirmed the ruling of the Court of Federal Claims in part and remanded for further determination of damages, suggesting that the damages award be increased by $63 million. (JX 278.) The Court of Federal Claims has not ruled yet on the remand.

In the interim, on September 25, 2008, the Office of Thrift Supervision ("OTS") seized WMB and appointed the Federal Deposit Insurance Corporation (the "FDIC") as receiver. (JX 102.) Immediately after its appointment as receiver, the FDIC sold substantially all of the assets of WMB to JPMorgan Chase Bank, N.A. ("JPMC") for approximately $1.8 billion and assumption of certain of WMB's liabilities. (JX 103.) On September 26, 2008, WMI filed a voluntary petition under chapter 11 of the Bankruptcy Code, together with its affiliate, WMI Investment Corp.

On April 12, 2010, this adversary proceeding was commenced by the filing of a complaint seeking a declaratory judgment

4

relating to the rights of the LTW Holders.  On June 16, 2010, WMI
filed Omnibus Objections to claims filed by some of the LTW
Holders asserting they were really equity interests not claims
and/or should be subordinated pursuant to section 510(b).  The
Court approved a stipulation certifying the adversary as a class
action on behalf of all LTW Holders.

On October 29, 2010, WMI filed a motion for summary judgment
on the Amended Complaint.  The motion was denied on January 7,
2011, because the Court found that there were disputed issues of
material fact.  Trial was held on September 12-14 and 20, 2011.
Post-trial briefs were filed and oral argument was heard on
November 23, 2011.  The matter is ripe for decision.


II.  <u>JURISDICTION</u>

This Court has jurisdiction over this adversary, which is a
core proceeding pursuant to 28 U.S.C. §§ 1334 & 157(b)(2)(A),
(B), (C), & (O).


III. <u>DISCUSSION</u>

A.   <u>Are the LTWs Debt or Equity?</u>

The threshold issue presented in the Amended Complaint is
whether the LTWs are debt or equity.  WMI in its summary judgment
motion argued that the issue could be easily addressed by
considering the plain language of the Warrant Agreement, as

amended after the merger with Dime, which provides that the LTW
Holders are only entitled to WMI common stock.  The LTW Holders
contended, however, that other provisions of the Warrant
Agreement, and subsequent events, demonstrate that they are
entitled to receive cash instead of simply stock.  (JX 1 at §§
4.2 & 4.3.)  The LTW Holders also argued that WMI (and its board
of directors) are required to assure that their rights are
protected.  (Id. at § 4.2(d).)

    In the summary judgment decision, the Court found that there
were genuine issues of disputed fact surrounding the intent of
the parties and the language of the Warrant Agreements because
WMI itself submitted extrinsic evidence regarding the intent of
the parties in issuing the LTWs and an expert opinion which
referenced similar securities issued by other banks at the time
the LTWs were issued.  This caused the LTW Holders to seek
discovery and the opportunity to present their own expert witness
on the relevant issues.

    1.    Language of the Agreements

    The documents issued in connection with the LTWs lend
support to WMI's position that the LTWs were intended to
represent equity, not debt, interests.  The original and Amended
Warrant Agreements and the Registration Statements plainly state
that the LTWs are warrants representing the right to purchase
shares of common stock.  (JX 1 at 1; JX 3 at 1; JX 4 at 1; JX 6

at 1; JX 7 at 1.)  The Warrant Agreements also confirm that the
Anchor Litigation belonged to the bank, not to the LTW Holders.
(JX 1 at § 6.3; JX 3 at § 6.3; JX 4 at § 6.3.)  Thus, any
settlement or judgment paid would go to the bank, not the LTW
Holders.  (JX 193 at 113.)  All of the Warrant Agreements and the
Prospectuses confirmed that the LTW Holders would be entitled to
exercise the warrant, and receive stock, only upon receipt of a
recovery by the bank and regulatory approval allowing the
issuance of the stock.  (JX 1 at Art. III; JX 3 at Art. III; JX 4
at Art. III; JX 6 at 2-3; JX 7 at 2.)

The LTW Holders contend, however, that under the terms of
the Warrant Agreement, their rights changed at the time of the
Dime/WMI merger in 2001.  As part of the merger, Dime
shareholders were entitled to elect to receive their pro rata
share of the $1.4 billion in cash and 92.3 million shares of WMI
common stock paid for Dime.  (JX 17 at 2.)[5]  As a result of the
merger consideration paid to the Dime shareholders, the LTW
Holders contend that under section 4.2 of the Warrant Agreement,

---

[5]  Approximately 76% of Dime shareholders elected to receive
stock and only 24% elected to receive cash by the January 4,
2002, deadline.  (Tr. 9/14/11 at 52-53.)  Dime shareholders who
made no election received WMI common stock.  (JX 42 at STB07306.)
Because there was not enough WMI stock to honor the stock
elections, ultimately those who elected stock actually received
11.6% in cash.  (JX 45.)  The issuance of stock was not taxable,
but the payment of cash was.  (JX 195 at 141.)

the LTW Holders are entitled to the same treatment.[6]

The Court finds that the Warrant Agreements, when considered together with documents issued at the time, are ambiguous.  SEC filings state that "Holders of Dime's litigation tracking warrants will not be affected by the merger, except that, upon any exercise of the litigation tracking warrants in accordance with their terms, holders of litigation tracking warrants will be entitled to receive shares of Washington Mutual common stock instead of Dime common stock on similar terms as prior to the merger."  (JX 19 at 2-3; JX 20 at 2-3.)  WMI argues that this meant that only common stock of WMI would be issued to the LTW Holders and that they did not have any right to receive cash. The LTW Holders argue, in contrast, that it simply means that WMI common stock will be substituted for Dime common stock but that their other rights (including the right to receive what the Dime shareholders received, i.e. cash) were preserved.

WMI argues that any ambiguity, however, was clarified by a notice sent to the LTW Holders which expressly stated that they will not be getting the same consideration as the Dime shareholders:

---

[6]  Section 4.2 provides in part that, in the event of a merger, the LTW Holders are entitled to "the number of shares of capital stock or other securities <u>or an amount of property</u>" to the same extent that "one share of Common Stock was exchanged for or converted into as a result of" the merger.  (JX 1 at § 4.2(a) (emphasis added).)

Following the closing of the Merger, each outstanding
LTW will entitle its holder to receive, upon exercise
of such LTW in accordance with the terms of the Warrant
Agreement, shares of Washington Mutual common stock.
Under the terms of the Merger Agreement, each share of
Dime common stock will be converted into either shares
of Washington Mutual common stock or cash, in each case
subject to cash/stock election and equalization
procedures.

(JX 41.)  Again the LTW Holders contend that this just addresses
the substitution of WMI stock for Dime stock but nowhere
expressly states that the LTW Holders' right to receive the same
consideration as the Dime shareholders was eliminated.

The Court finds the documents, and related filings,
sufficiently ambiguous to warrant the consideration of other
evidence to determine what rights were intended to be conveyed to
the LTW Holders.

> 2.  <u>Experts</u>

To clarify the intent of the documents, the parties offered
the testimony of expert witnesses on the issue of whether the
LTWs were debt or equity instruments.

> a.  <u>Dr. Chamberlain</u>

WMI's expert, Dr. Chamberlain, is a Ph.D. economist who
served as vice chair and board member of a thrift, as chief
economist for the Federal Home Loan Bank Board, and as an equity
analyst at Jeffries, Inc.  While she was at Jeffries, she
analyzed the LTWs when they were issued by Dime and other banks
and stated that the market viewed the LTWs as equity issuances,

9

not debt.  (Tr. 9/13/11 at 193-95.)  She testified that the
essential characteristic of a warrant is that it is a derivative
security representing a conditional interest in the company's
equity.  (Tr. 9/14/11 at 33; JX 233 at 32.)  She noted that the
LTWs, like typical equity warrants, had an exercise period (up to
sixty days after the trigger event) and a set price (the par
value of WMI's stock).  (Tr. 9/14/11 at 34.)  Even if they did
not, however, she felt that was not determinative.  (Id. at 31-
33; JX 137 at 1041; JX 195 at 49-50.)

She compared the LTWs to the Litigation Participation
Certificates (the "LPCs") issued by California Federal Bank and
Coast Federal Bank, which entitled their holders to a direct
interest in any recovery that those banks might receive in their
goodwill litigation.  (Tr. 9/13/11 at 196-97.)  As a result of
the LPC structure, those banks actually transferred their
goodwill litigation claim from their balance sheets to a trust or
directly to the LPC holders.  This structure created two problems
according to Dr. Chamberlain.  First, the banks lost the value of
that asset from their balance sheets and were unable to leverage
it to make money.  (Tr. 9/13/11 at 209-10.)  In addition, the
issuance of the LPCs to the shareholders was immediately taxable
to the shareholders, making it particularly difficult because any
recovery on the goodwill litigation was uncertain and in the
future.  (Tr. 9/13/11 at 134-35; JX 195 at 48, 53; JX 231 at 5.)

10

In contrast, Dr. Chamberlain noted that the LTWs allowed
Dime (and then WMI) to retain the Anchor Litigation recovery,
thereby increasing the value of its assets and ultimately its
stock price.  (Tr. 9/13/11 at 197; Tr. 9/14/11 at 11.)  The LTW
structure also would allow Dime (and later WMI) to reinvest those
funds to further grow its balance sheet.  (Tr. 9/12/11 at 132-34;
Tr. 9/13/11 at 197.)

The LTW Holders find fault with the opinion of WMI's expert
for several reasons.  First, Dr. Chamberlain had to admit that
the LPCs, like the LTWs, were traded on NASDAQ, not rated,
treated as equities by brokerage companies, and had been valued
in the same manner by her while she was at Jeffries.  (Tr.
9/13/11 at 211-14; Tr. 9/14/11 at 149-50; JXs 48, 52, 75 & 78;
Tr. 9/12/11 at 80-86; JX 107 at 3-4; JX 37 at 7; JX 80 at 20; JX
81 at 3, 9.)  In fact, Dr. Chamberlain testified that LPCs were
also equity, although they clearly are not because they are
payable in cash not stock.  (Tr. 9/14/11 at 142, 147-48, 156.)

Second, the LTW Holders criticize Dr. Chamberlain's
conclusion that the LTWs were equity because that was how the
market viewed them at the time.  (Tr. 9/13/11 at 214; Tr. 9/14/11
at 34, 200; JX 233 at 3, 27-28; JX 110 at 4.)  They note that (1)
she would not reveal whom she talked to, (2) admitted the
investors were really concerned only with when the lawsuit would
end and what it would pay, and (3) the investors never discussed

whether the LTWs were issuable in stock or cash.  (Tr. 9/14/11 at
200-06.)  Therefore, the LTW Holders contend that those
communications do not support her opinion that the LTWs are
equity and not debt.  Similarly, the LTW Holders found Dr.
Chamberlain's reliance on analysis done by Kevin Starke to be
faulty: his analysis was done during the course of this adversary
(not at the time the LTWs were issued) and is tainted by the fact
that his company is trading on the PIERS (which would be
adversely affected if the LTWs are found to be debt).  (Tr.
9/14/11 at 224-27; JX 133.)

     In addition, the LTW Holders contend that Dr. Chamberlain's
testimony about the tax, accounting, and regulatory features of
the LTWs was unconvincing.  For example, she admitted that the
fact that the litigation proceeds are taxable to WMI does not
make the LTWs equity.  (Tr. 9/14/11 at 175.)  Dr. Chamberlain
also had to admit that the risk that regulatory supervision might
prevent up-streaming the litigation proceeds to the holding
company was equally (if not more) applicable to the LPCs as to
the LTWs.  (Tr. 9/14/11 at 183-84; JX 9 at 3-4.)  Finally, the
LTW Holders assert that her analysis of the accounting rules was
based on her erroneous conclusion that the LTWs are not
liabilities because the obligation has not already arisen, when
in fact it arose upon issuance of the LTWs.  (Tr. 9/14/11 at 82,
209; JX 233 at ¶ 83 n.88; Tr. 9/12/11 at 111.)  They also

criticize her changing opinion of the importance of accounting
regulations when on cross it became clear that they did not
support her conclusion. (Tr. 9/14/11 at 207-12.)

The LTW Holders also dispute Dr. Chamberlain's conclusion
that the LTWs had "equity" risk because there was a delay between
the time that they became entitled to a distribution and the time
that the stock was actually distributed, during which time their
interests were dependent on the vagaries of the market value of
the WMI stock. (Tr. 9/13/11 at 217; JX 233 at 22-26.)  They note
that she never mentioned such a risk at the time she was
evaluating the LTWs while an analyst at Jeffries. (Tr. 9/14/11
at 196-98; Tr. 9/12/11 at 84-86; JX 107 at 3-4.)

The LTW Holders also criticized Dr. Chamberlain's chart
comparing the price of WMI's stock with the price of the LTWs
which she said showed their correlation. (JX 163; Tr. 9/14/11 at
21-25.)  They note that contrary to her belief that there was no
negative news relating to the LTWs during the period from March
to September 2008, in fact the Court of Claims in July 2008
reduced the judgment in the Anchor Litigation by $26 million and
in September 2008 the United States appealed that judgment and
the country was in the midst of a financial crisis causing all
the markets to drop. (Tr. 9/20/11 at 94.)  Further, they argue
that Dr. Chamberlain's comparison period was too constricted: it
started <u>after</u> the LTWs had gone up 300% on news of the positive

result of the Anchor Litigation (while WMI's stock was plummeting) and before November 2008 after which the LTWs went up in value (while WMI's stock remained in the cellar).  (Tr. 9/13/11 at 42; Tr. 9/14/11 at 171-72.)

Finally, the LTW Holders contend that Dr. Chamberlain's reading of the Warrant Agreements as requiring that the LTWs receive only stock ignores critical language which requires adjustments (specifically in the event there is a merger where cash is given to stockholders, which happened at the time of the Dime/WMI merger).  (Tr. 9/14/11 at 98-101, 107-10; JX 233 at ¶ 69; JX 1 at Art. IV.)  They also note her contradictory contentions about whether the LTWs had an exercise price or definitive exercise period.  (Tr. 9/14/11 at 34; JX 233 at ¶ 78.)

The Court found Dr. Chamberlain's opinion to be largely unconvincing.  Her testimony about how the market treated the LTWs was particularly suspect because it represented only her limited view of the market and apparently the market viewed both the LPCs and the LTWs the same, although they were structured differently.  Further, her efforts to find a similarity between the price at which the LTWs were trading and the price at which WMI's stock was trading was contorted and unconvincing.

### b.  Barry Levine

The LTW Holders presented the testimony of Barry Levine, who referred to SEC, FASB, and IASB literature to support his opinion

that, regardless of their label, the LTWs are in substance liabilities, not equity.  (Tr. 9/14/11 at 68-77; JXs 142, 154 & 168.)  Levine testified that the LTWs lack the traditional characteristics of equity warrants: they are exercisable for a variable number of shares (depending on the results of the Anchor Litigation), have no strike price, and have no finite period within which they must be exercised.  (Tr. 9/12/11 at 70-79; JX 142 at 7, ¶ 12; JX 154 at 4; JX 168 at 32.)  Levine opined that the LTWs cannot be seen as equity because their value is completely divorced economically from the value of WMI's stock (being dependent solely on the value of the Anchor Litigation). (Tr. 9/12/11 at 80-90; JX 232 at 19; JX 80 at 20; JX 37 at 7; JX 107 at 3-4.)  In this respect, he analogized them to asset-backed securities.  (Tr. 9/12/11 at 131.)

WMI contends that Levine's analogy of the LTWs to asset-backed securities is erroneous: there was no trust set up into which the Anchor Litigation was transferred and the LTWs were not "a security that is primarily serviced by the cash flows of a discrete pool of receivables or other financial assets . . . that by their terms convert into cash within a finite time period" issued by an entity whose activities are "limited to passively owning or holding the pool of assets."  17 C.F.R. § 229.1101(c)(1)&(2)(ii).

WMI also argues that the LTW Holders' expert was not an
expert.  He was not an accountant, but rather was a lawyer who
did not practice in any relevant area.  He merely reviewed
accounting literature and reiterated what the guidelines stated
regarding GAAP treatment of warrants.  (Tr. 9/12/11 at 57-59, 68-
79, 86-88, 93-98, 110-11.)  They contend that he ignored all the
documents and testimony of the people involved in the creation of
the LTWs in reaching his conclusion that the LTWs are debt
instruments.  They ask the Court to consider these factors in
evaluating what weight to give Levine's testimony.  See, e.g.,
Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146-47 (1997) (concluding
that trial court did not abuse its discretion in excluding expert
report because it found it was based on insufficient data); Dow
Chem. Can., Inc. v. HRD Corp., 656 F. Supp. 2d 427, 434 (D. Del.
2009) (denying motion to strike expert testimony on area in which
he was qualified but granting it in areas in which he was not or
which required application of the law).

The Court agrees with WMI that Levine's credentials did not
rise to the level of expertise in the areas relevant to this
case: the structure of debt or equity instruments, the tax bases
for using either, or the proper analysis of them from a
bankruptcy perspective.  In large part his testimony consisted
simply of reading GAAP regulations, without any citation to case
law or other authority construing them.  (Tr. 9/12/11 at 68.)

16

This is particularly unhelpful because an instrument's treatment under GAAP is not relevant to the question of whether an instrument is debt or equity.  See, e.g., In re EBC I, Inc. (f/k/a eToys, Inc.), 380 B.R. 348, 358 (Bankr. D. Del. 2008) ("GAAP rules for treating debt as equity and vice versa are not relevant to determining whether they are truly debt or equity."), aff'd, 382 F. App'x 135 (3d Cir. 2010); In re Joshua Slocom, Ltd., 103 B.R. 610, 622-24 (Bankr. E.D. Pa. 1989) (holding that redemption value of redeemable stock is not a debt despite its accounting treatment as a liability); Harbinger Cap. Parts. Master Fund I, Ltd. v. Granite Broad. Corp., 906 A.2d 218, 225 (Del. Ch. 2006) (holding that FAS150, which treated mandatorily redeemable shares as debt, is immaterial to the issue of whether they really were debt or equity).[7]

Further, in many significant areas, Levine's assumption of facts was proven to be erroneous.  For example, Levine claimed that equity warrants must have a fixed exercise price though he admitted that the Golden State equity warrant did not.  (Tr. 9/12/11 at 162, 167-69; JX 232 at 6, 17.)  He also claimed that the LTWs' anti-dilution provision made them debt not equity while ignoring the fact that equity warrants often contain similar

---

[7]  WMI also notes that the GAAP rule upon which the LTW Holders rely, FAS150, only became effective in May 2003.  Nothing changed about the nature of the LTWs that would warrant a finding that they became debt rather than equity after that date.

17

provisions.[8]  (Tr. 9/12/11 at 158; JX 232 at 18.)  Further,

contrary to Levine's opinion, an instrument can be equity even if

it has no time within which it must be exercised.  See, e.g.,

R.A. Mackie & Co., L.P. v. Petrocorp Inc., 329 F. Supp. 2d 477,

481 (S.D.N.Y. 2004) (holding that perpetual warrants with no

expiration date were equity nonetheless).  Therefore, the Court

finds Mr. Levine's testimony was not convincing.

        3.  Creators of the LTWs

    The testimony of the creators of the LTWs, in contrast, was

particularly compelling.  Sarkozy, from Credit Suisse First

Boston, was the person who created the LTWs in the first place,

as an "elegant solution" to the problem of conveying the economic

benefit of any recovery on the Anchor Litigation to the Dime

shareholders without tax consequences.  (JX 195 at 37-38, 44-45,

47-49, 128.)  Because the LPCs issued by other banks had conveyed

a direct interest in the goodwill litigation, they were taxable

on issuance to the shareholders of their respective institutions.

(Id. at 127-30.)  To avoid the problem of having to pay taxes on

phantom income before any recovery was received by the

shareholders, Sarkozy developed the LTWs.  (Id. at 34-38.)  He

---

    [8]  For example, the Golden State Five-Year Warrant, which
Levine acknowledged was a typical equity warrant, had anti-
dilution protections similar to the LTWs.  (JX 232 at 18 & n.26;
JX 56 at Ex. 4.3, § 2.01.)  Further, Glendale Federal Bank FSB
also had anti-dilution provisions in its seven-year equity
warrants.  (JX 56 at Ex. 4.3, § 3.03; JX 56 at Ex. 4.4, § 3.01(e)
& (k)).

testified that the key feature of the LTWs was that they conveyed a right to buy stock when the bank received a recovery in the Anchor Litigation (and presumably had a greater value), rather than a direct interest in the recovery itself.  (Id. at 38, 45, 48-50, 73, 127-28, 133-34, 155-56, 158.)  Because it was structured as a stock warrant, it was not taxable.  (Id. at 37-38, 55-56; Tr. 9/13/11 at 135; JX 231 at 4.)  Sarkozy's testimony made clear that the intent of the LTWs was to convey to the shareholders only a right to receive stock, not cash; otherwise, there would have been no tax benefit.  (JX 195 at 55-56, 128, 133-34, 155-56, 158.)

The actual drafter of the instruments, Mitchell Eitel of Sullivan and Cromwell, confirmed that intent: the LTW Holders were entitled only to stock, not to cash.  (JX 193 at 30, 113-16, 121-22.)  The LTWs were issued to the Dime shareholders as a dividend so that they (on exercise of the warrant) would have an increased equity interest in the bank commensurate with the increased value resulting from the Anchor Litigation recovery.  (Id. at 26-27, 49, 115-17.)  The Amended Registration Statement issued in connection with the LTWs contained a tax opinion letter from Sullivan and Cromwell confirming that the "distribution of the LTWs . . . should be treated as a tax-free stock dividend."  (JX 7 at 2, 20-21.)

19

Margaret McQuade, a director of Dime at the time also confirmed this intent: the LTWs entitled the holders only to stock. (JX 194 at 33-34, 55, 65-66, 71, 78, 97, 99, 113-14.) This was particularly important because the board did not want to create a taxable event for the shareholders. (Id. at 55.)

When WMI and Dime merged, the Warrant Agreement was amended in 2002 and 2003 to reflect that the LTWs would be issued in WMI common stock rather than Dime common stock. (JXs 3 & 5.) The person drafting the amendments did not believe that they made any material change to the rights of the LTW Holders under the original Warrant Agreement, other than to substitute WMI stock for Dime stock. (JX 198 at 23-25, 39, 87-88, 93, 122-23.) Sarkozy, who advised Dime during the WMI merger, testified that the merger was not meant to have any impact on the LTWs as warrants for the issuance of common stock, except that after the merger the LTW Holders would be entitled to WMI common stock rather than Dime common stock. (JX 195 at 107.) McQuade stated that while the Dime shareholders were entitled to elect cash or stock as a result of the merger, the LTWs were only entitled to WMI stock. (JX 194 at 65-66, 113-14, 122.) If, as the LTW Holders assert, they were entitled to the right to receive cash instead of stock as a result of the Dime/WMI merger, it would have been a taxable event, causing them to have to pay taxes, even though at that time they would receive nothing because there

20

had been no recovery on the Anchor Litigation.  (Tr. 9/13/11 at
131.)

The Court concludes, based on all of the documents and
testimony, that the LTWs are equity, not debt.  The Bankruptcy
Code defines "equity security" to include a "warrant or right,
other than a right to convert, to purchase, sell, or subscribe to
a share, security, or interest" of a "share in a corporation,
whether or not transferable or denominated 'stock,' or similar
instrument."  11 U.S.C. § 101(16).  See also In re Insilco Techs.
Inc., 480 F.3d 212, 218 (3d Cir. 2007); Allen v. Levey (In re
Allen), 226 B.R. 857, 865 (Bankr. N.D. Ill. 1998).  Factors which
courts consider in determining whether an instrument is equity
include whether the holder's right is guaranteed, the name given
to the instrument, the intent of the parties, the presence or
absence of a fixed maturity date, the right to enforce payment of
principal and interest, the presence or absence of voting rights,
and the holder's priority in payment.  The Court finds that
consideration of these factors support a finding that the LTWs
are equity.

Like stockholders, the LTW Holders' rights – even to receive
stock – are contingent on the financial solvency of the
corporation.  See, e.g., In re Revco D.S., Inc., 118 B.R. 468,
474 (Bankr. N.D. Ohio 1990) (holding that rights "to redeem stock
are not guaranteed but are dependent on the financial solvency of

the corporation"). Further, as found above, both the name given
to the instruments and the intent of the parties was that they be
convertible into equity. There was no fixed maturity date or
right to payment of a fixed amount of principal or interest,
suggesting that the LTWs are not debt. In re Color Tile, Nos.
96-76, 2000 WL 152129 (D. Del. Feb. 9, 2000). Finally, though
the LTWs had no voting rights, they would have had such rights
upon receiving their distribution of common stock. See, e.g.,
Granite, 906 A.2d at 231 & n.56 ("Although the right to vote is
necessarily a characteristic right of equity, its absence is not
fatal to a finding that a security is equity."). Therefore, the
Court concludes based on the language of the documents, the
testimony of the drafters of the instruments, the testimony of
the director at the time of the issuance, and the contemporaneous
press releases and disclosures that the LTWs were equity
instruments, entitling the LTW Holders to common stock in Dime
(and later in WMI).

Even if the LTW Holders were entitled to receive the same
merger consideration as the Dime shareholders received, however,
it is undisputed that there was no trigger event (the receipt of
funds from the Anchor litigation) mandating that payment, before
WMI filed its bankruptcy petition. Where equity instruments
share debt-like qualities, such as cash options, courts will not
elevate them to the status of debt in the bankruptcy context

22

unless the option was exercised before the bankruptcy petition
was filed.  See, e.g., Carrieri v. Jobs.com, Inc., 393 F.3d 508,
522 (5th Cir. 2004) (holding that "warrants with [cash]
redemption provisions . . . are equity interests until their
expiration (or until the right to receive a cash payment properly
matures on or before the petition date).") (citations omitted);
In re Einstein Noah Bagel Corp., 257 B.R. 499, 507 (Bankr. D.
Ariz. 2000) (holding that put right requiring debtor to purchase
claimant's ownership interests in cash or stock was an equity
interest even if "construed to create an obligatory cash payment"
because the right to receive cash had not matured before the
bankruptcy petition was filed) (citations omitted).  Therefore,
the Court concludes that the LTWs are equity instruments.

    B.   Did WMI Breach the Warrant Agreement?

    The LTW Holders contend nonetheless that WMI has breached
various provisions of the Amended Warrant Agreement under which
the LTW Holders are entitled to receive cash or other property
instead of simply stock.  (JX 4, Art. 4.)  They argue, for
example, that under section 4.2 of the original Warrant
Agreement,[9] they were entitled to receive whatever the Dime

---

    [9]  Section 4.2(a) provided:
    Except as provided in Section 4.2(c) [where
    shareholders get paid totally in cash, entitling the
    LTWs to receive cash], the Holders will have the right
    to receive upon exercise of each Warrant the number of
    shares of capital stock or other securities or an
    amount of property equal to the Adjusted Litigation

23

shareholders received in the merger with WMI, which was a right

to elect cash or stock (or at least to receive a combination of

both).  (JX 1 at § 4.2(a); JX 12 at §§ 2.10 & 2.15; JX 3 at §

4.2; JX 4 at § 4.2; Tr. 9/12/11 at 98-99; Tr. 9/14/11 at 109-10;

JX 195 at 95-97; JX 193 at 142.)

The LTW Holders note that when Golden State merged,

resulting in its shareholders receiving a combination of cash and

stock, its LTW holders were given the same right when their

goodwill litigation was resolved.  (JX 61 at 1.)  The LTW Holders

contend that case law supports their argument that they are

entitled to receive cash, as well as stock, and that therefore

they must be treated as creditors.  See, e.g., Mackie & Co., 329

F. Supp. 2d at 503 (holding that, under terms of warrant

agreement at issue, warrant holders should "have the opportunity,

upon payment of the exercise price, to convert their Warrants -

after the merger and at a time of their choosing - into all of

the merger consideration offered to [the acquired company's]

shareholders."); Continental Airlines Corp. v. Am. Gen. Corp.,

575 A.2d 1160, 1164, 1168 (Del. 1990) (finding that holder of

warrants had the right to receive the same merger consideration

---

Recovery divided by the Maximum Number of Warrants
divided by the aggregate Adjusted Stock Price of the
capital stock, other securities or property that 1.1232
shares of Common Stock were exchanged for or converted
into as a result of such Combination.

(JX 1 at § 4.2(a).)

as other shareholders received based on the contractual rights
set forth in the warrant).

WMI argues that any claim that the LTW Holders are entitled
to the same consideration as the Dime shareholders received at
the time of the merger in 2001 is not supported by the Amended
Warrant Agreements, which provide that they are only entitled to
WMI stock.  WMI contends that to the extent that they breached
the original Warrant Agreement by not giving the LTW Holders the
merger consideration that the Dime shareholders received, the
statute of limitations has run.

The Court finds it unnecessary to decide the statute of
limitations argument because even if the LTW Holders have a right
under section 4.2(a) to the same merger consideration that the
Dime shareholders received, that still does not change their
interest from an equity interest to a claim.  Even where owners
of equity instruments have the right to require that they receive
cash rather than stock, courts hold that they are not claims, but
are still only equity if the option was not exercised before the
bankruptcy petition was filed.  See, e.g., Carrieri, 393 F.3d at
522 (holding that warrants with cash redemption provisions are
equity interests unless the right to receive a cash payment
matured before the petition date); Einstein Noah Bagel, 257 B.R.
at 507 (Bankr. D. Ariz. 2000) (holding that put right requiring
debtor to purchase claimant's ownership interests in cash or

stock was an equity interest because the right to receive cash
had not matured before the bankruptcy petition was filed).
Therefore, the Court concludes that, even if the LTW Holders had
the right to elect cash (or to receive the same percentage in
cash as the Dime shareholders did), because that right did not
arise before the bankruptcy case was filed, their interests
remain only equity interests.

The LTW Holders also argue that WMI has breached the Warrant
Agreements because under the Global Settlement Agreement ("GSA")
WMI is selling substantially all its assets to JPMC and has not
assured that JPMC will enter into an agreement confirming that
the LTW Holders retain their interests in the Anchor Litigation.
(Tr. 9/20/11 at 32-42; JX 4 at §§ 1.1, 4.2(d) & 6.3.)[10]  WMI
responds that section 4.2(d) is not applicable because the GSA is
not a Combination under the Amended Warrant Agreement but rather
is a global settlement of competing claims of ownership to
various assets.  (Tr. 9/20/11 at 18-20.)

The Court agrees that the GSA is not a sale of substantially
all the assets of WMI.  Rather, it settles various disputes

_____

[10]  Section 4.2(d) of the Amended Warrant Agreement requires
that upon entering into any Combination (which includes a sale of
substantially all of its assets), WMI will assure that any
successor "will enter into . . . an agreement with the Warrant
Agent confirming the [LTW] Holders' rights pursuant to this
Section 4.2 and providing for adjustments, which will be as
nearly equivalent as may be practicable to the adjustments
provided for in this Article."  (JX 4 at §§ 1.1 & 4.2(d).)

between JPMC and WMI as to who owned what assets.  In particular, it resolves a dispute as to who owned the Anchor Litigation. Because JPMC acquired WMB, JPMC took the position that it, as the successor to Anchor Bank, owned the Anchor Litigation. Therefore, the Court finds that section 4.2(d) is not applicable.

The LTW Holders finally contend that under section 4.4 of the Amended Warrant Agreement, WMI must assure that the LTW Holders receive the value of the Anchor Litigation.[11]  WMI responds that the obligation of the board of directors under section 4.4 is permissive only, not mandatory: "the Board may make, without the consent of the Holders, such adjustments." (JX 4 at § 4.4 (emphasis added).)  Therefore, WMI contends that it is not required to make any adjustments to protect the rights of the LTW Holders.

The Court agrees that section 4.4 is permissive, not mandatory, and cannot form the basis for a claim of breach of the

---

[11]   Section 4.4 provides:
If any event occurs as to which the foregoing provisions of this Article IV are not strictly applicable or, if strictly applicable, would not, in the good faith judgment of the Board, fairly and adequately protect the rights of the Holders of the Warrants in accordance with the essential intent and principles of such provisions, then the Board may make, without the consent of the Holders, such adjustments to the terms of this Article IV, in accordance with such essential intent and principles, as will be reasonably necessary, in the good faith opinion of such Board, to protect such purchase rights as aforesaid.
(JX 4 at § 4.4.)

Warrant Agreement.  This is so particularly where WMI is in a bankruptcy proceeding and is precluded by its fiduciary obligations to the creditors from taking any action to prefer equity holders, such as the LTW Holders.  Therefore, the Court concludes that there has been no breach of the Warrant Agreements that would give rise to a claim in this case.

C.   Are the LTW Holders' Claims Subordinated?

Even if the Court were to find that the LTW Holders have a claim for breach of the Warrant Agreement, WMI argues that that claim must be subordinated to the level of the common shareholder interests under section 510(b) of the Code.

The Court agrees with WMI.  Section 510(b) provides that "a claim arising from rescissions of a purchase or sale of a security of a debtor . . . for damages arising from the purchase or sale of such a security . . . shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock."  11 U.S.C. § 510(b).  The Code definition of "equity security" includes warrants.  Id. at § 101(16)(C).  A claim must be subordinated if it "arises from the purchase or sale" of a security or there is "some nexus or causal relationship between the claims and the purchase of the securities."  Baroda Hill Invs., Ltd. v. Telegroup, Inc. (In re

Telegroup, Inc.), 281 F.3d 133, 138, 144 (3d Cir. 2002) (holding

shareholder claims for breach of provision in stock purchase

agreement were properly subordinated).  See also In re Int'l

Wireless Commc'ns Holdings, Inc., 257 B.R. 739, 743 (Bankr. D.

Del. 2001) (subordinating claim arising from debtor's breach of

agreement to repurchase stock for a set amount if it failed to

have an initial public offering by a certain date), aff'd, 279

B.R. 463 (D. Del. 2002), aff'd, 68 F. App'x 275 (3d Cir. 2003);

In re Touch Am. Holdings, Inc., 381 B.R. 95, 103-06 (Bankr. D.

Del. 2008) (subordinating indemnification claims which would not

exist but for underlying suit based on purchase of debtor's

stock).  In this case, the LTW Holders' claims are based on

breach of the Warrant Agreement pursuant to which they are

entitled to receive common stock of WMI.  Those claims fit

squarely within the purview of section 510(b) and must be

subordinated.

The LTW Holders contend that their claims do not arise from

the "purchase" or "sale" of a security because the LTWs were

distributed to them for no consideration and if anything, they

were securities of Dime, not WMI.[12]

---

[12]  The LTW Holders also argue that section 510(b) is
inapplicable because the LTWs are debt instruments not
securities.  See, e.g., Official Comm. of Unsecured Creditors v.
Am. Cap. Fin. Servs., Inc. (In re Mobile Tool Int'l, Inc.), 306
B.R. 778, 782 (Bankr. D. Del. 2004) (holding that section 510(b)
is not applicable to debt instruments, even if issued to a
shareholder).  The Court rejects this argument because, for the

This, however, misses the point.  The LTWs are warrants representing the right to receive common stock of WMI once the Anchor Litigation is resolved.  The claim which the LTW Holders assert here is that WMI has breached the Warrant Agreement by failing to assure that they receive a specific value (85% of the Anchor Litigation recovery).  The only way that the LTW Holders are entitled to receive that value, however, is by exercising their right to acquire common stock of WMI.  Thus, their claims clearly relate to a breach of an agreement to acquire stock in WMI and must be subordinated under section 510(b) to the level of common stock.

D.   <u>Is the Anchor Litigation Property of the Estate?</u>

The LTW Holders also contend that WMI cannot convey the Anchor Litigation to JPMC as part of the Global Settlement Agreement because 85% of the beneficial interest in that Litigation belongs to the LTW Holders.  That interest, they argue, is not property of the estate.  11 U.S.C. § 541(d) ("Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not

reasons stated above, it concludes that the LTWs are equity instruments, not debt.

hold."). <u>See also</u> <u>Official Comm. of Unsecured Creditors of the</u>
<u>Columbia Gas Transmission Corp. v. Columbia Gas Sys. Inc. (In re</u>
<u>Columbia Gas Sys. Inc.)</u>, 997 F.2d 1039, 1054 (3d Cir. 1993)
(stating that "[a] bankruptcy estate includes all property of the
debtor, but only to the extent of the debtor's equitable interest
in such property.").

Therefore, the LTW Holders seek a declaratory judgment that
they are entitled to receive 85% of the Anchor Litigation in
cash.  They also assert that the imposition of a constructive
trust on 85% of the proceeds of the Anchor Litigation is
warranted. <u>See, e.g.</u>, <u>Simonds v. Simonds</u>, 45 N.Y.2d 233, 242,
(N.Y. 1978) (holding that unjust enrichment "does not require the
performance of any wrongful act by the one enriched.  Innocent
parties may frequently be unjustly enriched.  What is required,
generally, is that a party hold property 'under such
circumstances that in equity and good conscience he ought not to
retain it.'") (quoting <u>Miller v. Schloss</u>, 113 N.E. 337, 339 (N.Y.
1916)).

The Court disagrees.  As noted above, the Court finds that
the LTWs do not entitle the LTW Holders to an interest in the
Anchor Litigation itself.  They are only entitled to the issuance
of common stock in WMI.  Therefore, the Court concludes that the
Anchor Litigation itself is property of the estate and may be
conveyed by WMI to JPMC as part of the GSA pursuant to section

363 of the Bankruptcy Code.

IV.    <u>CONCLUSION</u>

    For the reasons set forth above, the Court will grant judgment in favor of WMI.

    An appropriate order is attached.

Dated: January 3, 2012        BY THE COURT:

                             Mary F. Walrath
                             United States Bankruptcy Judge